# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | | |
|---|---|---|
| RON SEARS, KEN JOSEPH, and MARTIN and CLAIRE ACKMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | **Case No. 02-60493 Martinez** |
| | ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| VINCENT TAN and AYMAN SABI, | ) ) | |
| Defendants. | ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Second Amended Class Action Complaint (the "Complaint"), make the following allegations upon information and belief, based upon the facts set forth below, which were obtained through an extensive investigation made by and through their attorneys. Plaintiffs' investigation included, among other things, a review and analysis of the following: various public statements and filings made by Roadhouse Grill, Inc. ("Roadhouse Grill" or the "Company") and its senior officers and directors with the Securities and Exchange Commission ("SEC"); transcripts of depositions of certain Roadhouse Grill officers taken in connection with the Company's bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Florida; the reports of securities analysts concerning the Company; and press releases, media reports, and other publicly available documents regarding the Company. Except as alleged herein, the underlying information concerning Defendants' misconduct is not available to Plaintiffs and lies within the exclusive possession and control of Defendants. Based on the evidence already developed, Plaintiffs

believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of all purchasers of the common stock of Roadhouse Grill between August 31, 1998 and August 1, 2001, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants for inflating the market price of Roadhouse Grill securities by issuing materially misleading and fraudulent financial statements to the investing public and filing such materially misleading and fraudulent financial statements with the SEC.

2.     During the Class Period, Roadhouse Grill's books were in such complete disarray that it was severely reckless or fraudulent for the Company to issue financial statements at all.  For much of the Class Period, the Company's accounting department was a farce, barely staffed and relying on uncertified accountants.  The accounting department, which prepared the Company's financial statements, failed to perform fundamental book keeping such as reconciling the general ledger and improperly accounted for rebates as revenue.  As a result, quarter after quarter, year after year, the Company's financial statements were severely recklessly or fraudulently filed with the SEC in violation of Generally Accepted Accounting Principles ("GAAP"), not withstanding the Company's representations in those filings that the financial statements were prepared in accordance with GAAP, until the Company restated its financial statements on August 14, 2001.

3.      In fact, as alleged herein, the former Chief Financial Officer of Roadhouse Grill, Harry Paul Rosenfeld ("Rosenfeld"), stated in sworn deposition testimony taken on April 12, 2002 in connection with Roadhouse Grill's Chapter 11 bankruptcy proceeding, In re Roadhouse Grill, Inc., No. 02-20382 B.C.-R.B.R. (Bankr. S.D. Fla. Jan. 18, 2002)[1] that prior to his arrival at the Company in the late summer of 2000: the Company never reconciled its general ledger (which contained the expenses subsequently restated); that the Company was overstating revenue; and that the Company's financial statements had not been prepared in accordance with GAAP.  Importantly, Rosenfeld testified that he urged senior management and the Board of Directors of the Company to restate the Company's financial statements at least a full quarter before the Company finally issued its restatement.  Rosenfeld further testified that management was aware of the accounting improprieties during the Class Period and, indeed, that he personally kept Defendant Ayman Sabi ("Sabi") apprized of these serious accounting problems, alerting Sabi to the failings of the Company's financial statements and its accounting records within days after Rosenfeld's arrival at the Company.

4.      As a public company, Roadhouse Grill had a duty to ensure that the financial statements it issued were prepared in accordance with GAAP and were accurately reported to the investing public.  However, Defendants concealed the truth about the Company's financial condition and shirked their responsibilities by knowingly and/or with severe recklessness issuing materially misstated financial statements throughout the Class Period.

5.      The Class Period begins on August 31, 1998, when Roadhouse Grill issued the first of its eleven materially false and misleading SEC filings.  As alleged herein, the

---

[1] Referred to herein as "Rosenfeld Dep. at ___."

Class Period financial statements failed to accurately state the Company's financial results by materially misstating net income, expenses, retained earnings, revenue, and other balance sheet items. These material misstatements misled the investing public and artificially inflated the market price of Roadhouse Grill securities.

6.      The Class Period ends on August 1, 2001, when Roadhouse Grill announced that the Company would review its financial statements and would likely restate its earnings for at least the prior two years. On that date, the Company revealed for the first time that the Company's accounting for various expenses had been materially misstated and that a restatement would result in a "material decrease in net income for the fiscal years ended April 25, 1999 and April 30, 2000 and the related quarterly periods." The Company also revealed that the proposed restatement may be necessary "as a result of inaccuracies that have been identified in the company's accounting for various operating expenses."

7.      The Company's announcement on August 1, 2001 of its proposed restatement prompted the NASDAQ to immediately suspend trading of Roadhouse Grill stock. Then on August 14, 2001, Roadhouse Grill filed its restated financial statements with the SEC for fiscal years 1999 and 2000 and the related quarters and for the quarters ended July 30, 2000, October 29, 2000, and January 28, 2001.

8.      The restated SEC filings admitted that the statements made during the Class Period concerning the Company's financial results were materially false and misleading. As a result of this admission of false reporting, the Company's common stock, which had traded as high as $6.875 on July 6, 1999, plummeted $0.59 per share to $0.60 – a drop of nearly 50 percent -- when trading resumed on September 10, 2001.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and

78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission

("SEC") [ 17 C.F.R. § 240.10b-5].

10.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act,

and 28 U.S.C. § 1391(b).  The acts and practices complained of herein occurred in substantial

part in this District.

12.     Roadhouse Grill maintains its principal place of business in Pompano Beach,

Florida, where the day-to-day operations of the Company are directed and managed.

13.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## PARTIES

14.     Ron Sears, Ken Joseph, and Martin and Claire Ackman were appointed Lead

Plaintiffs in this action by the Court on July 9, 2002.  Lead Plaintiffs purchased shares of

Roadhouse Grill common stock at artificially inflated prices during the Class Period and were

damaged thereby.

15.     Roadhouse Grill, a Delaware corporation with its principal executive offices located at 2703-A Gateway Drive, Pompano Beach, Florida 33069, was formerly named as a Defendant in this action.  Roadhouse Grill was subsequently placed into bankruptcy. Pursuant to the Plan of Reorganization approved by the United States Bankruptcy Court on or about August 23, 2002.  Plaintiffs' have been enjoined from continuing the action as against Roadhouse Grill.  Roadhouse Grill purports to be an international restaurant chain. Roadhouse Grill owns and operates 72 full-service, casual dining restaurants under the name "Roadhouse Grill".

16.     Defendant Vincent Tan ("Tan") is, and at all times relevant to the allegations raised herein was, Chairman of the Board of Roadhouse Grill.  Tan is also Chairman and Chief Executive Officer of Berjaya Group Berhad, a Malaysian company that owns Berjaya, the majority shareholder of Roadhouse Grill.  Tan signed Roadhouse Grill's Annual Report on Form 10-K for the fiscal year ended April 25, 1999, filed with the SEC on or about July 26, 1999, and he also signed Roadhouse Grill's Annual Report on Form 10-K for the fiscal year ended April 30, 2000, filed with the SEC on or about August 31, 2000.  Tan resides in Malaysia.

17.     Defendant Ayman Sabi ("Sabi") is, and at all times relevant to the allegations raised herein was, President, Chief Executive Officer, and a Director of Roadhouse Grill. Sabi signed each of Roadhouse Grill's Annual Reports on Form 10-K filed with the SEC during the Class Period, as well as each of Roadhouse Grill's Quarterly Reports filed on Form 10-Q filed with the SEC during the Class Period.  On both the July 31, 2000 Form10-K and the August 31, 2000 Amended Form 10-K for fiscal year ended April 30, 2000, Sabi

6

signed as "Acting Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer)" in addition to signing as President, CEO, and Director.

18.     Defendants Tan and Sabi are referred to herein as the "Individual Defendants."

19.     During the Class Period, the Individual Defendants had access to the adverse undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including Roadhouse Grill's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

20.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Roadhouse Grill's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Defendant Sabi by virtue of his high-level positions with Roadhouse Grill, directly participated in the management of Roadhouse Grill, was directly involved in the day-to-day operations of Roadhouse Grill at the highest levels and was privy to confidential proprietary information concerning Roadhouse Grill and its businesses, operations, products, growth, financial statements, and financial condition, as alleged herein.  Defendant Sabi was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and

misleading statements were being issued regarding Roadhouse Grill, and approved or ratified these statements, in violation of the federal securities laws. Defendant Tan, by virtue of his position as Chairman of the Board of Directors and his beneficial ownership of a majority of Roadhouse Grill stock, was privy to confidential proprietary information concerning Roadhouse Grill and its business, operations, products, growth, financial statements, and financial condition as alleged herein. Tan was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or was severely reckless in disregarding, that the false and misleading statements were being issued regarding Roadhouse Grill, and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers, directors and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ") and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Roadhouse Grill's financial condition, performance, growth, operations, financial statements, businesses, products, markets, management, earnings, present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Roadhouse Grill's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or were severely reckless in disregarding, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Roadhouse Grill, each of the Individual Defendants had access to the adverse undisclosed information about Roadhouse Grill's business prospects and financial condition and performance as particularized herein and knew (or were severely reckless in disregarding) that these adverse facts rendered the positive representations made by or about Roadhouse Grill and their businesses issued or adopted by Roadhouse Grill materially false and misleading.

23.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases herein and therefore is primarily liable for the representations contained therein.

24.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Roadhouse Grill common stock

9

by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Roadhouse Grill's businesses, operations, management and the intrinsic value of their common stock and caused Plaintiffs and the other members of the Class to purchase Roadhouse Grill securities at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

25.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other purchasers of Roadhouse Grill common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Roadhouse Grill, its subsidiaries and affiliates, the Individual Defendants and members of their immediate families and their legal representatives, heirs, successors, predecessors or assigns, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, predecessors or assigns, and any entity in which any Defendant has or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Roadhouse Grill common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Roadhouse Grill or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendants violated the federal securities laws by making material misrepresentations or by omitting to state material facts necessary to render statements made not misleading;

b.     Whether the market prices of the Company's publicly traded securities during the Class Period were artificially inflated due to statements made by Defendants to the investing public during the Class Period, which misrepresented material facts about the financial statements, financial condition, businesses, operations, and management of Roadhouse Grill; and

c.     Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

31.     Roadhouse Grill operates, franchises and licenses high-quality full-service casual dining restaurants. According to the Company's 1999 Form 10-K, the Company was the largest operator of the roadhouse-style casual dining restaurant concept in the United States. The Company was founded in 1992 and opened its first Roadhouse Grill restaurant in Pembroke Pines, Florida in 1993. Roadhouse Grill restaurants offer a diverse, moderately priced lunch and dinner menu highlighting exhibition cooking of steaks and other grilled entrees. The restaurants feature daily fresh baked yeast rolls, appetizers, and homemade ice cream as signature items.

32.     The common stock of the Company had been listed on the Nasdaq National Market System since the Company's initial public offering on November 26, 1996 and traded during the Class Period under the symbol "GRLL".

33.     As a public company, the SEC and Sections 13(b)(2)-(7) of the Exchange Act require that Defendants "make and keep books, records, and accounts, which . . . accurately and fairly reflect the transactions and dispositions of assets . . . and must maintain internal accounting controls that are sufficient to provide reasonable assurances that . . . transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP" as these statements are relied upon by the investing public.

34.     However, in a press release issued on the <u>Business Wire</u> on August 1, 2000, Roadhouse Grill admitted that it had materially understated operating expenses throughout the Class Period which had the effect of materially overstating the Company's earnings in its publicly-issued financial statements throughout the Class Period.  As a result of the disclosure of these financial improprieties, the Company announced that it was preparing to restate its earnings for prior periods.  In response to the proposed restatement, NASDAQ halted trading of Roadhouse common stock and it did not resume until September 10, 2001.

35.     On August 14, 2001, Roadhouse Grill filed its restated financial statements with the SEC for fiscal years 1999 and 2000 (and related quarters) and the fiscal quarters ended July 30, 2000, October 29, 2000, and January 28, 2001.  The magnitude of the restatement was substantial.  For example, for fiscal 2000, net income was reduced from $3,512,000 to $2,606,000 – a drop of $906,000 – representing a stunning 25% reduction in the Company's net income for the year and for fiscal 1999, net income was reduced from $6,008,000 to $5,708,000 – a drop of $300,00, amounting to a 4% reduction in the Company's net income for the year.

36.     Shortly thereafter, Roadhouse Grill's auditors, KPMG, issued a going concern warning expressing doubt that the Company had the ability to continue as a going concern. KPMG also cited defaults under certain loan agreements in issuing the warning.

37.     By early 2002, Roadhouse Grill was forced into involuntary bankruptcy by certain of its creditors.  In the course of the bankruptcy proceedings, Rosenfeld, the Chief Financial Officer of Roadhouse Grill during a significant portion of the Class Period testified in a sworn deposition as to how Defendants knowingly or with severe recklessness violated

GAAP by overstating the Company's income, revenue, and earnings throughout the Class Period.

**The Former Chief Financial Officer Reveals the Truth**

38.     Rosenfeld came to Roadhouse Grill as a consultant in August 2000.

39.     During September 2000, Rosenfeld was named Chief Financial Officer. Rosenfeld testified that he was told by Sabi that he "would be the chief financial officer, which includes closing the books on a monthly basis, arranging financing when necessary, work with lenders, work with creditors. I was dealing with the SEC, if there was any SEC issues. I was dealing with the external auditors." Rosenfeld Dep. at 13-14.

**The Books Were "HORRIFIC"**

40.     When Rosenfeld arrived at the Company in August 2000, he found that the accounting department at Roadhouse Grill was in shambles. Rosenfeld stated that the former Chief Financial Officer, Glen Glasshagel ("Glasshagel"), left two or three months before the offer was made to Rosenfeld to become the Chief Financial Officer. Rosenfeld testified that his first week there, there was no controller, no assistant controller, and only "two so-called accountants . . . [and] one of them didn't have a degree . . . ." Rosenfeld Dep. at 18.

41.     Following Glasshagel's departure, Sabi had performed the duties of the Chief Financial Officer. Sabi was not a Certified Public Accountant and did not have a background as an auditor. Rather, as Sabi testified in his deposition taken on March 4, 2002 in connection with Roadhouse Grill's Chapter 11 bankruptcy proceeding, In re Roadhouse Grill, Inc., No. 02-20382 B.C.-R.B.R. (Bankr. S.D. Fla. Jan. 18, 2002 ), he held an undergraduate degree from North Carolina State University, where he majored in sociology, with a minor in

14

philosophy and psychology.  Sabi Dep. at 11-12.  His only business classes were "a few

economy classes and similar classes."  Sabi Dep. at 12.  Nevertheless, on the Company's

July 31, 2000, Annual Report on Form 10-K filed with the SEC and the Company's August

31, 2000, Amended Annual Report on Form 10-K also filed with the SEC, Sabi signed both

as "Acting Chief Financial Officer (Principal Financial Officer and Principal Accounting

Officer)."

42.    Rosenfeld testified that the state of affairs of the financial books and records

when he arrived at Roadhouse Grill was "Horrific."  Rosenfeld Dep. at 18.

**General Ledger Not Reconciled for Years**

43.    The general ledger is the basis of a company's financial statements.  The

general ledger at Roadhouse Grill contained the accounts for expenses that were later

restated.   Rosenfeld testified that he spent five months after his arrival at the Company going

back and reconciling the general ledger which had been misstated throughout the Class

Period prior to his arrival.  Rosenfeld testified that he had to hire an assistant controller to

assist with the massive task of reconciling the general ledger for the previous "four or five

years."  Rosenfeld Dep. at 21.

44.    Shockingly, Rosenfeld discovered that for years before he became the Chief

Financial Officer, the general ledger had not been reconciled.  Rosenfeld testified:

> [t]hey had filed a 10Q on the 12th or 13th of September [2000], and [Defendant
> Sabi] said, please come in and get the Q filed for me, so what I did was, I
> reviewed the balance sheet very quickly, I brought all the staff accountants
> into the room, and said, listen, I need to see all reconciliations for the general
> ledger account, which is something that you normally get at public companies,
> and I was told we don't – **we haven't reconciled these accounts in a couple
> of years**. [Emphasis added.]

Rosenfeld Dep. at 19.

45.    Rosenfeld admitted that he filed false and misleading SEC filings based on incorrect assumptions as Rosenfeld signed the September 13, 2000 Report on Form 10-Q, the December 13, 2000 Report on Form 10-Q, and the March 14, 2001 Report on Form 10-Q. Rosenfeld testified:

> **I made some assumptions at the time which later proved to be wrong**, and one was that the proper taxes and accruals would be right, that the deferred rent would be right, pre-paid rent would be right, that the cash account would be reconciled properly, the assets would be reconciled, the general ledger, the basic things, and that the staff at the end of fiscal 2000 would have tied those numbers out, at least, and would have gone in correct because you can't sign off audits without looking at it to make sure you a have a list of outstanding checks, deposits and transactions. [Emphasis added.]

Rosenfeld Dep. at 20-21.

46.    Rosenfeld provided additional examples of accounts that had not been accounted for in accordance with GAAP during the Class Period until the Company filed its restated financial statements.  Rosenfeld testified that:

a.    The "Corporate Deposits were overstated" by approximately $300,000. "They had taken some deposit money they received back, taken it against the deposits." Rosenfeld Dep. at 25.

b.    "They had deferred rent, which is an accounting process, where if you have step-up, step-up escalation clause in a rent – in rent on a property you have to straight line the rest over the entire life of the lease.  The deferred rent was wrong.  They weren't booking enough deferred rent." Rosenfeld Dep. at 25.

c.    "I found out the bank account wasn't being properly reconciled, we took a hit for that . . . .  When I made them actually reconcile, go through back a couple of

16

year[s], there was a financial impact of about one hundred thousand dollars."  Rosenfeld Dep.

at 25.

    d.  The Self Funded Medical Insurance was also not reconciled properly.

Rosenfeld Dep. at 26.

   47.  Rosenfeld testified that "[b]asically every general ledger account that we went

though was, in fact, not properly reconciled along with things such as accrued expenses . . . ."

Rosenfeld Dep. at 26.

   **Rebates - Improper Recognition of Revenue**

   48.  Rosenfeld also testified that the Company was improperly accounting for

rebates as revenue in violation of GAAP.  One such rebate was for Colorado Box Beef, in

which $200,000 was improperly booked as revenue.  Rosenfeld Dep. at 22.

   49.  With respect to the Colorado Box Beef transaction, Rosenfeld testified:

> The company, at the end of fiscal 2000 book – in the last week a rebate from
> Colorado Box Beef of two hundred thousand dollars, **there was no support**
> **for the book of the two hundred thousand dollars.  I have never been able**
> **to find any support for it. . . .**
>
> I've talked to Mark, former vice-president of operations, David Faulk, there
> has been no issue, based on GAAP – there's no way you could – there is no
> way you could have ever booked this as a rebate, it would either be spread
> over the life of the contract, from an account perspective, but there also would
> need to be some documentation which, never existed, and this is one of the
> things that the SEC investigated. . . .
>
> **It was a rebate.  They took it as income but there's no rationale from an**
> **accounting perspective to do it, to ever do it, unless you have contract that**
> **says even if this contract is void you get to keep the money** but there – I
> have never been able to find one document on the rebate. [Emphasis added.]

Rosenfeld Dep. at 22-23.

50.     Rosenfeld's understanding was that when Roadhouse Grill signed an agreement for Colorado Beef to supply meat to Roadhouse Grill, "Colorado Box Beef offered to give them [Roadhouse Grill] a signing bonus of two hundred thousand dollars, [but] that two hundred thousand dollars never existed." According to Rosenfeld, "[o]ne of the things I heard was they [Roadhouse Grill] gave it back in the price of the contract over the next thirteen weeks." Rosenfeld testified that, "[f]rom an accounting perspective, you must spread it over the life of the contract. There is no accounting rationale to take that into income." Rosenfeld Dep. at 23.

51.     Rosenfeld also testified that a Coke Rebate was also over booked. The rebates were considered income which again violated GAAP. Rosenfeld testified that **"It was not Generally Accepted Accounting."** Rosenfeld Dep. at 24. Rosenfeld further testified that: **"As I went through these books I found far more problems with every account**." [Emphasis added.] Rosenfeld Dep. at 23.

**Sabi Knew The Financial Statements Were Wrong**

52.     Rosenfeld testified that he informed Sabi about the unreconciled general ledger problem shortly after he accepted the position of Chief Financial Officer in September of 2000. When asked, **"Did you bring these discrepancies and these problems to the attention of Mr. Sabi?"** Rosenfeld testified, "Yes I did . . . . [w]e discussed all of them." Rosenfeld Dep. at 27. Rosenfeld testified that after telling Sabi of these major accounting problems, Rosenfeld began reconciling the accounts. When asked if he kept Sabi informed of what he was doing, Rosenfeld testified, "I kept him apprised and the Board of Directors." Rosenfeld Dep. at 28.

53.     In January 2001, after Rosenfeld had been finally able to reconcile nearly all the accounts, Rosenfeld recommended that the Company restate it earnings for prior periods at the end of the in the third quarter of fiscal 2001.  Rosenfeld was asked, "[l]et me put it this way, after four or five months were the book [sic] reconciled to the best of your understanding?"  Rosenfeld testified:

> Except for one account the answer is yes, **and I recommended to the Board of Directors an [sic] audit company committee -- that the company restate earnings at the end of the third quarter of fiscal 2001.** [Emphasis added.]

Rosenfeld Dep. at 28.

Rosenfeld was then asked, "[w]hat specifically was the basis for that?"  He testified:

> Based on the fact that I believe -- based on SAB 99, which is the criteria for restatement, based on SEC rules, that this was material in nature and the books and records of the company definitely needed to be restated.

Rosenfeld Dep. at 28-29.

54.     Also during January of 2001, Rosenfeld also informed Sabi that "that there was, in fact, another three hundred thousand dollars worth of errors that I had found that I could not substantiate, [I] wanted to write off . . . ."  Rosenfeld Dep. at 29-30.

55.     Rosenfeld confirmed that he told Sabi that the financial statements overstated revenues, and overstated earnings enough to require a financial restatement.  Rosenfeld Dep. at 27.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD

56.     The Class Period begins on August 31, 1998.  On that date, Roadhouse Grill

filed a Report on Form 10-Q with the SEC that stated the Company's financial results for the

quarter ended July 26, 1998.  The Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the
> fiscal quarters ended July 26, 1998 and July 27, 1997 are unaudited and reflect
> all adjustments (consisting of normal recurring adjustments) which are, in the
> opinion of management, necessary for a fair presentation of the financial
> statements for the interim periods.  The financial statements should be read in
> conjunction with the notes to condensed financial statements, together with
> management's discussion and analysis of financial condition and results of
> operations, contained in the Company's Annual Report on Form 10-K for the
> 17 weeks ended April 26, 1998 (the "transition period").

* * *

> Total revenues increased $5.9 million, or 26.0%, from $23.1 million for the
> first quarter of 1998 to $29.0 million for the first quarter of 1999.  This
> increase is primarily attributable to 10 Company-owned restaurant openings
> and an increase in comparable store sales of 0.2% for the 30 Company-owned
> restaurants opened for 18 months or longer.

57.     The Company filed the following financial results in the above filing:

|  | Fiscal Quarter Ended | |
|---|---|---|
|  | July 26, 1998 | July 27, 1997 |
| Total revenue | $29,040,361 | $23,083,009 |
| Cost of restaurant sales: | | |
| food and beverage | $9,608,215 | $7,695,642 |
| Labor and benefits | 8,232,892 | 7,009,079 |
| Occupancy and other | 5,821,087 | 4,422,891 |
| Pre-opening amortization | 363,355 | 555,053 |
| Total cost of restaurant sales | $24,025,549 | $19,682,665 |
| Depreciation and amortization | $1,716,503 | $1,210,416 |
| General and administrative | $1,630,808 | $2,082,971 |
| Total operating expenses | $27,372,860 | $22,976,052 |
| Operating income | $1,667,501 | $106,957 |

20

| Other income (expense): | | |
|---|---|---|
| Interest expense, net | ($497,050) | ($327,607) |
| Equity in net income of affiliates | 31,744 | 26,383 |
| Other, net | 92,775 | 88,660 |
| Total other income (expense) | ($372,531) | ($212,564) |
| Pretax income (loss) | $1,294,970 | ($105,607) |
| Income tax | $34,939 | $42,700 |
| Net income (loss) | $1,260,031 | ($148,307) |
| Basic net income (loss) per common share | $0.14 | ($0.02) |
| Diluted net income (loss) per common share | $0.13 | ($0.02) |
| Weighted average common shares outstanding | $9,308,411 | $9,305,408 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution | $9,523,738 | $9,305,408 |

58.     However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

59.     The restated financials for the fiscal quarter ended July 26, 1998 are:

| | Fiscal Quarter Ended | |
|---|---|---|
| | July 26, 1998 | July 27, 1997 |
| | (As restated) | |
| Total revenue | $29,133,136 | $23,171,669 |
| Cost of restaurant sales: | | |
| Food and beverage | $9,890,847 | $7,913,326 |
| Labor and benefits | $8,232,936 | $7,009,079 |
| Occupancy and other | $5,571,932 | $4,205,207 |
| Pre-opening amortization | $363,355 | $555,053 |
| Total cost of restaurant sales | $24,059,070 | $19,682,665 |
| Depreciation and amortization | $1,716,503 | $1,210,416 |

21

| | | |
|---|---|---|
| General and administrative | $1,630,808 | $2,082,971 |
| Total operating expenses | $27,406,381 | $22,976,052 |
| Operating income | $1,726,755 | $195,617 |
| Other income (expense): Interest expense, net | ($497,050) | ($327,607) |
| Equity in net income of affiliates | $31,744 | $26,383 |
| Other, net | -- | -- |
| Total other (expense) | ($465,306) | ($301,224) |
| Pretax income (loss) | $1,261,449 | ($105,607) |
| Income tax | $10,303 | $42,700 |
| Net income (loss) | $1,251,146 | ($148,307) |
| Basic net income (loss) per common share | $0.13 | ($0.02) |
| Diluted net income (loss) per common share | $0.13 | ($0.02) |
| Weighted average common shares outstanding | $9,308,411 | $9,305,408 |
| Weighted average common shares and share equivalents outstanding-assuming dilution | $9,523,738 | $9,305,408 |

60.     The financial results for the fiscal quarter ended July 26, 1998, as set forth in paragraphs 56-57 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; and Defendants were overstating revenue.

Defendants knew or were severely reckless in not knowing, of a number of red flags and

warning signs of improprieties that would have alerted them to the fact that the Company's

financial statements were not being prepared in conformity with GAAP.  They knew or were

severely reckless in not knowing that the Company's general accounts were not properly

reconciled and that the Company had woefully deficient internal accounting controls; directly

or indirectly, manipulated earnings; and published the financial results of the Company while

they were in possession of or had access to facts suggesting that the statements were

inaccurate, misleading, or incomplete.

61.     On December 1, 1998, Defendants issued a press release over the <u>Business</u>

<u>Wire</u> stating, "Roadhouse Grill Reports Record Second Quarter; 23% Increase in Revenue."

The Company's press release stated that:

> The Company reported a 23% increase in total revenues to $28,181,000 in the
> fiscal year 1999 second quarter from $22,866,000 in the comparable period in
> fiscal year 1998. Operating income for the fiscal year 1999 second quarter
> climbed 168% to $1,472,000 from $549,000 in the comparable prior year
> period. Net income increased to $904,000 in the fiscal year 1999 second
> quarter from $69,000 in the comparable period of fiscal year 1998. Diluted
> earnings per share rose to $0.10 in the fiscal 1999 second quarter from $0.01 in
> the fiscal year 1998 comparable period. Same store sales increased 2% in the
> fiscal year 1999 second quarter.

> Roadhouse Grill, Inc. total revenues increased nearly 25% for the fiscal year
> 1999 first half to $57,221,000 from $45,950,000 in the comparable first half of
> fiscal 1998. Operating income improved 377% to $3,139,000 in the fiscal year
> 1999 first half from $658,000 in the comparable 1998 fiscal year. Net income
> in the fiscal year 1999 first half rose to $2,165,000 from a net loss of $77,000
> during the comparable period of fiscal 1998. Diluted earnings per share
> increased to $0.23 for the fiscal year 1999 first half from a net loss of $0.01 in
> the comparable prior fiscal year period.

62.     On December 8, 1998, Roadhouse Grill filed a Report on Form 10-Q with the

SEC that stated the Company's financial results for the quarter ended October 25, 1998. The

Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the
> thirteen weeks and twenty-six weeks ended October 25, 1998 and October 26,
> 1997, are unaudited and reflect all adjustments (consisting of normal recurring
> adjustments) which are, in the opinion of management, necessary for a fair
> presentation of the financial statements for the interim periods. The financial
> statements should be read in conjunction with the notes to condensed financial
> statements, included herein, together with management's discussion and
> analysis of financial condition and results of operations, contained in the
> Company's Annual Report on Form 10-K for the seventeen weeks ended April
> 26, 1998 (the "transition period").

* * *

> Total revenues increased $5.3 million, or 23.2%, from $22.9 million for the fiscal
> year 1998 second quarter to $28.2 million for the fiscal year 1999 second quarter.
> This increase is primarily attributable to sales generated at the nine new
> restaurants opened by the Company since the end of fiscal year 1998 second
> quarter. To a lesser extent, sales also increased due to an increase in comparable
> store sales of 2% for the 32 Company-owned restaurants opened for 18 months or
> longer.

63.     The Company filed the following financial results in the above filing:

|  | Thirteen Weeks Ended | | Twenty-six Weeks Ended | |
|---|---|---|---|---|
|  | October 25, 1998 | October 26, 1997 | October 25, 1998 | October 26, 1997 |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . . | $28,181 | $22,866 | $57,221 | $45,950 |
| Cost of restaurant sales: |  |  |  |  |
|    Food and beverage . . . . . . . . . . . . . . | $9,431 | $7,766 | $19,039 | $15,462 |
|    Labor and benefits . . . . . . . . . . . . . . | $8,058 | $6,833 | $16,291 | $13,842 |
|    Occupancy and other . . . . . . . . . . . . | $5,316 | $4,510 | $11,137 | $8,932 |
|    Pre-opening amortization . . . . . . . . . | $367 | $500 | $730 | $1,054 |
|    Total cost of restaurant sales . . . . . . . | $23,172 | $19,609 | $47,197 | $39,290 |

| | | | | |
|---|---|---|---|---|
| Depreciation and amortization . . . . . . . . . . . . . . | $1,839 | $1,384 | $3,556 | $2,595 |
| General and administrative . . . . . . . . . . . . . . . . . | $1,698 | $1,324 | $3,329 | $3,407 |
| Total operating expenses . . . . . . . . . . | $26,709 | $22,317 | $54,082 | $45,292 |
| Operating income . . . . . . . . . . . . . . . | $1,472 | $549 | $3,139 | 658 |
| Other income (expense): | | | | |
| Interest expense, net . . . . . . . . . . . . . | ($585) | ($536) | ($1,082) | ($864) |
| Equity in net income of affiliates . . . | (35) | 7 | (3) | 33 |
| Other, net . . . . . . . . . . . . . . . . . . . . . | 102 | 99 | 195 | 188 |
| Total other (expense) . . . . . . . . . . . . | ($518) | ($430) | ($890) | ($643) |
| Pretax income | $954 | $119 | $2,249 | $15 |
| Income tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $50 | $50 | $84 | $92 |
| Net income (loss) . . . . . . . . . . . . . . . | $904 | $69 | $2,165 | ($77) |
| Basic net income (loss) per common share . . . . . | $0.10 | $0.01 | $0.23 | ($0.01) |
| Diluted net income (loss) per common share . . . | $0.10 | $0.01 | $0.23 | ($0.01) |
| Weighted average common shares outstanding | $9,423,027 | $9,305,408 | $9,365,719 | $9,305,408 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . . . . | $9,486,874 | $9,305,879 | $9,507,768 | $9,305,408 |

64.     However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

65.    The restated financials are:

| | Thirteen Weeks Ended | | Twenty-six Weeks Ended | |
|---|---|---|---|---|
| | October 25, 1998 | October 26, 1997 | October 25, 1998 | October 26, 1997 |
| Total revenue .......................... | (As restated) | | (As restated) | |
| | $ 28,282 | $22,965 | $ 57,416 | $46,138 |
| Cost of restaurant sales: | | | | |
| food and beverage ............... | $9,690 | $7,978 | $19,582 | $15,891 |
| Labor and benefits .............. | $8,058 | $6,833 | $16,291 | $13,842 |
| Occupancy and other ............ | $5,090 | $4,298 | $10,662 | $8,503 |
| Pre-opening amortization ......... | $367 | $500 | $731 | $1,054 |
| Total cost of restaurant sales ....... | $23,205 | $19,609 | $47,266 | $39,290 |
| Depreciation and amortization .............. | $1,839 | $1,384 | $3,556 | $2,595 |
| General and administrative .................. | $1,698 | $1,324 | $3,329 | $3,407 |
| Total operating expenses .......... | $26,742 | $22,317 | $54,151 | $45,292 |
| Operating income ............... | $1,540 | $648 | $3,265 | $846 |
| Other income (expense): | | | | |
| Interest expense, net ............. | ($585) | ($536) | ($1,082) | ($864) |
| Equity in net income (loss) of affiliates ...................................... | ($35) | $7 | ($3) | $33 |
| Total other (expense) ............ | ($620) | ($529) | ($1,085) | ($831) |
| Pretax income .................. | $920 | $119 | $2,180 | $15 |
| Income tax ................................. | $8 | $50 | $17 | $92 |
| Net income (loss) ................ | $912 | $69 | $2,163 | ($77) |
| Basic net income (loss) per common share ..... | $0.10 | $0.01 | $0.23 | ($0.01) |
| Diluted net income (loss) per common share ... | $0.10 | $0.01 | $0.23 | ($0.01) |
| Weighted average common shares outstanding | $9,423,027 | $9,305,408 | $9,365,719 | $9,305,408 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution ...................... | $9,486,874 | $9,305,879 | $9,507,768 | $9,305,408 |

66.    The statement that "Roadhouse Grill Reports Record Second Quarter; 23%

Increase in Revenue" and the financial results for the fiscal quarter ended October 25, 1998, as

set forth in paragraphs 61-64 above, were knowingly or with severe recklessness misstated by
Defendants and were materially misleading as evidenced by the restatement of the Company's
financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to
Defendants' representations that the financial statements "reflect all adjustments (consisting of
normal recurring adjustments) which are, in the opinion of management necessary for a fair
presentation of the financial statements for the interim periods," in fact, Defendants knew or
were severely reckless in not knowing that these financial statements were not prepared in
conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40,
42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition
testimony that the General Ledger had not been reconciled for years; the Company was not
keeping its books in accordance with GAAP; and Defendants were overstating revenue.
Defendants knew or were severely reckless in not knowing of a number of red flags and
warning signs of improprieties that would have alerted them to the fact that the Company's
financial statements were not being prepared in conformity with GAAP.  They knew or were
severely reckless in not knowing that the Company's general accounts were not properly
reconciled and that the Company had woefully deficient internal accounting controls; directly
or indirectly, manipulated earnings; and published the financial results of the Company while
they were in possession of or had access to facts suggesting that the statements were
inaccurate, misleading, or incomplete.

    67.    On December 22, 1998, the Company issued a press release on the <u>Business</u>
<u>Wire</u> announcing, "Roadhouse Grill Opens 48th Company-Owned Restaurant Initiating New
Expansion Plan."  In this release, Sabi stated, "We spent most of 1998 implementing the first

two phases of our turnaround plan by revising operations and initiating new procedures for greater profitability. Our efforts have been rewarded with demonstrably improved financial results in the first two quarters of fiscal 1999."

68.     The statements "initiating new procedures for greater profitability" and the "demonstrably improved financial results" were severely reckless or knowingly false and misleading as Defendants knew, or were severely reckless in not knowing, that the financial statements were not prepared in conformity with GAAP and contained serious accounting errors that rendered the Company's financial results materially false and misleading. As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; and Defendants were overstating revenue. Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP. They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly, manipulated earnings; and published the financial results of the Company while they were in possession of or had access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

69.     On February 22, 1999, Defendants issued a press release over the <u>Business Wire</u> reporting," Roadhouse Grill Reports Record $.18 Per Share Third Quarter Earnings." The release stated:

28

The Company reported a 15% increase in total revenues to $28.7 million in its fiscal 1999 third quarter from $25.0 million in the comparable period in fiscal 1998. Operating income rose 85% to $2.2 million from $1.2 million in the period last year. Net income grew to $1.7 million in the third quarter versus a loss of $1.1 million last year. Included in the prior year comparable quarter were non-recurring charges amounting to $1.7 million. Excluding those charges, the Company had net income of $600,000. . . .

On a per share basis diluted earnings per share amounted to $0.18 in the third quarter versus a loss of $0.12 in the comparable period.

Revenues for the first nine months increased 21% to $86.0 million from $71.0 million in the comparable period of fiscal 1998. Operating income for the nine-month period improved 189% to $5.4 million as compared to $1.9 million in the comparable period last year. Net income rose to $3.9 million or $0.40 per share on a diluted basis, versus a net loss of $1.2 million, or $0.12 per share, in the prior year.

The release also stated that:

Ayman Sabi, who was named President and Chief Executive Officer of the Company in February 1998 to improve the Company's financial performance, was very pleased with results. Mr. Sabi stated, "A year ago, we shifted our priority from adding new restaurant locations to fixing and improving operating results at the existing restaurant base. As a result operating margins at the restaurant level have increased slightly more than 20%, from 15.2% of sales in the nine-month period of fiscal year 1998 to 18.3% of sales for the nine-month period of fiscal year 1999. Our program to fix margins," Mr. Sabi emphasized, "has worked. Now we expect to build on this success, increasing the rate at which we add additional units."

70. Sabi's statements and the financial results for the fiscal quarter ended January 29, 1999, as set forth in paragraph 69 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in paragraphs 73-74 below. In fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors. As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in

sworn deposition testimony that the General Ledger had not been reconciled for years; the

Company was not keeping its books in accordance with GAAP; and Defendants were

overstating revenue.  Defendants knew or were severely reckless in not knowing of a number

of red flags and warning signs of improprieties that would have alerted them to the fact that

the Company's financial statements were not being prepared in conformity with GAAP.  They

knew or were severely reckless in not knowing that the Company's general accounts were not

properly reconciled and that the Company had woefully deficient internal accounting controls;

directly or indirectly, manipulated earnings; and published the financial results of the

Company while they were in possession of or had access to facts suggesting that the

statements were inaccurate, misleading, or incomplete.

71.    On March 10, 1999, Defendants filed the Company's Report on Form 10-Q

with the SEC that set forth the Company's financial results for the fiscal quarter ended January

24, 1999.  The Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the
> thirteen weeks and thirty-nine weeks ended January 24, 1999 and January 25,
> 1998, are unaudited and reflect all adjustments (consisting of normal recurring
> adjustments) which are, in the opinion of management, necessary for a fair
> presentation of the financial statements for the interim periods. The financial
> statements should be read in conjunction with the notes to condensed financial
> statements included herein, together with management's discussion and
> analysis of financial condition and results of operations, contained in the
> Company's Annual Report on Form 10-K for the seventeen weeks ended April
> 26, 1998 (the "transition period").

* * *

> Total revenues increased $3.7 million, or 14.7%, from $25.0 million for the
> fiscal year 1998 third quarter to $28.7 million for the fiscal year 1999 third
> quarter. This increase is primarily attributable to sales generated at the seven
> new restaurants opened by the Company since the end of fiscal year 1998 third

quarter. Sales at comparable stores for the fiscal year 1999 third quarter were even with sales in the prior year comparable period. This was due in part to the late start of the tourist season in Florida. At the end of fiscal year 1999 third quarter, the Company operated 27 restaurants in Florida.

72.    The Company filed the following financial results in the above filing:

|  | Thirteen Weeks Ended | | Twenty-Nine Weeks Ended | |
|---|---|---|---|---|
|  | January 24, 1999 | January 25, 1998 | January 24, 1999 | January 25, 1998 |
| Total revenue | $28,749 | $25,043 | $85,970 | $70,992 |
| Cost of restaurant sales: | | | | |
| Food and beverage | $9,236 | $8,264 | $28,275 | $23,726 |
| Labor and benefits | $8,100 | $7,445 | $24,391 | $21,287 |
| Occupancy and other | $5,385 | $4,814 | $16,522 | $13,746 |
| Pre-opening amortization | $298 | $377 | $1,028 | $1,431 |
| Total cost of restaurant sales | $23,019 | $20,900 | $70,216 | $60,190 |
| Depreciation and amortization | $1,894 | $1,426 | $5,450 | $4,021 |
| General and administrative | $1,623 | $1,522 | $4,952 | $4,929 |
| Total operating expenses | $26,536 | $23,848 | $80,618 | $69,140 |
| Operating income | $2,213 | $1,195 | $5,352 | $1,852 |
| Other income (expense): | | | | |
| Interest expense, net | ($544) | ($529) | ($1,626) | ($1,393) |
| Equity in net income (loss) of affiliates | -- | $19 | ($3) | $52 |
| Loss on sale of investment in affiliate | -- | ($611) | -- | ($611) |
| Impairment of long-lived assets | -- | ($1,120) | -- | ($1,120) |
| Other, Net | $97 | $47 | -- | $235 |
| Total other (expense) | ($447) | ($2,194) | ($1,337) | ($2,837) |
| Pretax income (loss) | $1,766 | ($999) | $4,015 | ($985) |
| Income tax | $50 | $74 | $134 | $166 |
| Net income (loss) | $1,716 | ($1,073) | $3,881 | ($1,151) |
| Basic net income (loss) per common share | $0.18 | ($0.12) | $0.41 | ($0.12) |
| Diluted net income (loss) per common share | $0.18 | ($0.12) | $0.40 | ($0.12) |
| Weighted average common shares outstanding | $9,708,741 | $9,305,408 | $9,480,894 | $9,305,408 |

31

| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . . . | $9,801,463 | $9,305,408 | $ 9, 606,097 | $9,305,408 |
|---|---|---|---|---|

73.    However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

74.    The restated financials are:

|  | Thirteen Weeks Ended | | Twenty-Nine Weeks Ended | |
|---|---|---|---|---|
|  | January 24, 1999 | January 25, 1998 | January 24, 1999 | January 25, 1998 |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . . . | $28,846 | $25,090 | $86,261 | $71,227 |
| Cost of restaurant sales: |  |  |  |  |
| Food and beverage . . . . . . . . . . . . . . | $9,486 | $8,490 | $29,067 | $24,381 |
| Labor and benefits . . . . . . . . . . . . . . | $8,100 | $7,445 | $24,391 | $21,287 |
| Occupancy and other . . . . . . . . . . . . | $5,178 | $4,588 | $15,840 | $13,091 |
| Pre-opening amortization . . . . . . . . . | $298 | $377 | $1,028 | $1,432 |
| Total cost of restaurant sales . . . . . . . | $23,062 | $20,900 | $70,326 | $60,191 |
| Depreciation and amortization . . . . . . . . . . . . . . | $1,894 | $1,426 | $5,450 | $4,020 |
| General and administrative . . . . . . . . . . . . . . . . . | $1,623 | $1,522 | $4,952 | $4,929 |
| Total operating expenses . . . . . . . . . . | $26,579 | $23,848 | $80,728 | $69,140 |
| Operating income . . . . . . . . . . . . . . . | $2,267 | $1,242 | $5,533 | $2,087 |
| Other income (expense): |  |  |  |  |
| Interest expense, net . . . . . . . . . . . . . | ($544) | ($529) | ($1,626) | ($1,393) |
| Equity in net income (loss) of affiliates . . . . . . . | -- | $19 | ($3) | $52 |
| Loss on sale of investment in affiliate . . . . . . . . | -- | ($611) | -- | ($611) |
| Impairment of long-lived assets | -- | ($1,120) | -- | ($1,120) |

| | | | |
|---|---|---|---|
| Total other income (expense) . . . . . | ($544) | ($2,241) | ($1,629) | ($3,072) |
| Pretax income (loss) . . . . . . . . . . . . . | $1,723 | ($999) | $3,904 | ($985) |
| Income tax . . . . . . . . . . . . . . . . . . . . . . . . . . | $14 | $74 | $32 | $167 |
| Net income (loss) . . . . . . . . . . . . . . . | $1,709 | ($1,073) | $3,872 | ($1,152) |
| Basic net income (loss) per common share . . . . . | $0.18 | ($0.12) | $0.41 | ($0.12) |
| Diluted net income (loss) per common share . . . | $0.17 | ($0.12) | $0.40 | ($0.12) |
| Weighted average common shares outstanding | $9,708,741 | $9,305,408 | $9,480,894 | $9,305,408 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . . . | $9,801,463 | $9,305,408 | $ 9,606,097 | $9,305,408 |

75.     The financial results for the fiscal quarter ended January 24, 1999, as set forth in paragraphs 71-72 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; and Defendants were overstating revenue. Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP.  They knew or were

severely reckless in not knowing that the Company's general accounts were not properly

reconciled and that the Company had woefully deficient internal accounting controls; directly

or indirectly, manipulated earnings; and published the financial results of the Company while

they were in possession of or had access to facts suggesting that the statements were

inaccurate, misleading, or incomplete.

76.     On June 2, 1999, Defendants issued a press release over the <u>Business Wire</u>

reporting, "Roadhouse Grill Reports Record Fiscal Fourth Quarter & Year-End Results."  The

Company stated:

> The Company reported a 19% increase in total revenues to $34.7 million in its
> fourth quarter of fiscal 1999 from $29.2 million in the comparable period in
> fiscal 1998. Operating income rose 39% to $2.7 million in the fourth quarter
> from $2.0 million in the same period last year. Net income grew to $2.1 million
> in the fourth quarter of fiscal 1999 versus $1.5 million last year. Diluted
> earnings per share in the fourth quarter of fiscal 1999 amounted to $0.22 versus
> $0.16 in the same period of fiscal 1998. Same store sales for the quarter were
> equal with the prior year period.
>
> Revenues for fiscal year 1999 increased 20% to $120.7 million from $100.2
> million for fiscal year 1998. Operating income for fiscal year 1999 improved
> 199% to $8.1 million as compared to $2.7 million in the comparable period last
> year. Net income rose to $6.0 million or $0.62 per share on a diluted basis,
> versus net income of $353,000, or $0.04 per diluted share for fiscal year 1998.
> Same store sales increased slightly less than 1% during fiscal 1999.

The release also stated:

> Ayman Sabi, President and Chief Executive Officer, said, "This performance is
> the best in Roadhouse Grill's history and clearly demonstrates the success of
> our turnaround program. Recently there has been a great deal of publicity
> surrounding our industry's renewed focus on store-level operations. Roadhouse
> Grill, Inc. initiated a turnaround program over a year ago that halted expansion
> while emphasizing increased operational efficiencies and performance
> company-wide that resulted in improved same store sales and significantly
> better operating margins. **The dramatic improvement in Roadhouse Grill's**

**operating income is a wonderful testament to our efforts**." [Emphasis added.]

77.    On July 26, 1999, Defendants filed the Company's Annual Report on Form

10-K with the SEC that reported the Company's financial results for the fiscal year ended

April 25, 1999.  The Report on Form 10-K stated, in pertinent part, as follows:

> During the fourth calendar quarter of 1997, the Company's management team formulated a three-point plan to improve the Company's operating performance. Plan points were as follows: 1. IMPROVE UNIT ECONOMICS AND OPERATING MARGINS by better managing food, labor and other operating costs. 2. INCREASE SAME STORE SALES PERFORMANCE through increased advertising and greater brand awareness. 3. ENHANCE REAL ESTATE AND NEW RESTAURANT DEVELOPMENT through improved site selection and better construction management.  During fiscal year 1999, the Company realized significant benefits from the implementation of the three-point plan as evidenced by the Company's operating performance during the fiscal year.

* * *

> In addition to operating Company-owned restaurants, the Company franchises others to operate Roadhouse Grill restaurants. The company currently has three franchisees: Roadhouse Operating Company, LLC, Roadhouse Grill Asia Pacific (H.K.) Limited ("Roadhouse Grill Hong Kong") and Roadhouse Grill Asia Pacific (Cayman) Limited ("Roadhouse Grill Asia"). Berjaya Group (Cayman) Limited ("Berjaya"), the majority shareholder of the Company, directly or indirectly owns Roadhouse Grill Hong Kong and Roadhouse Grill Asia.

* * *

> Total revenues increased $20.5 million, or 20.4%, from $100.2 million for fiscal year 1998 to $120.7 million for fiscal year 1999. This increase is primarily attributable to sales generated at the 12 new restaurants opened by the Company since the end of fiscal year 1998 and the full year operations of the 10 new restaurants opened in fiscal year 1998 that were open and operating only partially during fiscal year 1998. Sales at comparable restaurants for fiscal year 1999 were even with sales in the prior year comparable period. This was due in part to the late start of the tourist season in Florida. At the end of fiscal year 1999, the

Company operated 31 Company-owned restaurants in Florida. A restaurant is considered comparable after its first 18 months of operation.

78.     The Company filed the following financial results in the above filing:

| | FISCAL | (UNAUDITED) FISCAL | (UNAUDITED) 17 WEEKS ENDED APRIL 26, | 17 WEEKS ENDED APRIL 27, | FISCAL | FISCAL | FISCAL |
|---|---|---|---|---|---|---|---|
| STATEMENT OF OPERATIONS DATA: | 1999 | 1998 | 1998 | 1997 | 1997 | 1996 | 1995 |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . | $120,681 | $100,194 | $37,684 | $30,285 | $92,795 | $62,433 | $34,275 |
| Cost of restaurant sales: | | | | | | | |
| Food and beverage . . . . . . . . . . . . . . | $39,505 | $33,065 | $12,130 | $10,056 | $30,991 | $21,382 | $12,084 |
| Labor and benefits . . . . . . . . . . . . . . | $33,897 | $29,232 | $10,340 | $8,957 | $27,849 | $19,748 | $12,019 |
| Occupancy and other . . . . . . . . . . . | $23,776 | $19,938 | $7,856 | $5,495 | $17,577 | $12,747 | $8,197 |
| Pre-opening amortization . . . . . . . . | $1,318 | $1,822 | $520 | $719 | $2,021 | $1,027 | $513 |
| Total cost of restaurant sales . . . . . . | $98,496 | $84,057 | $30,846 | $25,227 | $78,438 | $54,904 | $32,813 |
| Depreciation and amortization . . . . . . . . . . . . . . | $7,351 | $5,672 | $2,145 | $1,454 | $4,981 | $3,136 | $1,663 |
| General and administrative . . . . . . . . . . . . . . . . . | $6,766 | $6,645 | $2,210 | $1,773 | $6,208 | $4,471 | $3,328 |
| Impairment of long-lived assets . . . . . . . . . . . . . | -- | $1,120 | -- | -- | $1,120 | -- | -- |
| Total operating expenses . . . . . . . . . | $112,613 | $97,494 | $35,201 | $28,454 | $90,747 | $62,511 | $37,804 |
| Operating income (loss) . . . . . . . . . . . . . . . . . . | $8,068 | $2,700 | $2,483 | $1,831 | $2,048 | ($78) | ($3,529) |
| Other income (expense): | | | | | | | |
| Interest expense, net . . . . . . . . . . . | ($2,210) | ($1,924) | ($719) | ($347) | ($1,552) | ($1,296) | ($404) |
| Equity in net income (loss) of affiliates (1) . . . . . . . . . . . . . . . . | ($3) | $90 | $57 | $29 | $62 | $206 | $284 |
| Other, net . . . . . . . . . . . . . . . . . . . . . | $386 | $314 | $119 | $110 | $320 | $278 | $159 |
| Loss on sale of investment in affiliate . . . . . . . . | -- | ($611) | -- | -- | ($611) | -- | -- |
| Total other income (expense) . . . . . | ($1,827) | ($2,131) | ($543) | ($208) | ($1,781) | ($812) | $39 |
| Pretax income (loss) . . . . . . . . . . . . | $6,241 | $569 | $1,940 | $1,623 | $267 | ($890) | ($3,490) |
| Income tax expense . . . . . . . . . . . . . | $233 | $216 | $81 | $40 | $175 | -- | -- |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . | $6,008 | $353 | $1,859 | $1,583 | $92 | ($890) | ($3,490) |
| Basic net income (loss) per common share . . . . | $0.63 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) | ($1.00) |
| Diluted net income (loss) per common share . . . | $0.62 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) | ($1.00) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Weighted average common shares outstanding | $9,536,631 | $9,305,408 | $9,305,408 | $9,305,408 | $9,305,408 | $4,909,894 | $3,496,570 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . | $9,668,469 | $9,315,139 | $9,326,642 | $9,315,307 | $9,305,408 | $4,909,894 | $3,496,570 |

79.     However on August 14, 2001, the Company restated those same financial results. In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

80.     The restated financials are:

| | FISCAL | (UNAUDITED) FISCAL | (UNAUDITED) 17 WEEKS ENDED APRIL 26, | (UNAUDITED) 17 WEEKS ENDED APRIL 27, | FISCAL | FISCAL | FISCAL |
|---|---|---|---|---|---|---|---|
| STATEMENT OF OPERATIONS DATA: | 1999 | 1998(1) | 1998(10) | 1997(1) | 1997(1) | 1996(1) | 1995(1) |
| | (As restated) | | | | | | |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . . | $121,067 | $100,508 | $37,803 | $30,395 | $93,115 | $62,711 | $34,434 |
| Cost of restaurant sales: | | | | | | | |
| Food and beverage . . . . . . . . . . . . . . | $40,606 | $34,002 | $12,487 | $10,360 | $31,876 | $22,045 | $12,084 |
| Labor and benefits . . . . . . . . . . . . . . | $33,969 | $29,232 | $10,340 | $8,957 | $27,849 | $19,748 | $12,019 |
| Occupancy and other . . . . . . . . . . . . | $23,089 | $19,001 | $74,999 | $5,191 | $16,692 | $12,084 | $8,197 |
| Pre-opening amortization . . . . . . . . . | $1,318 | $1,822 | $520 | $719 | $2,021 | $1,027 | $513 |
| Total cost of restaurant sales . . . . . . | $98,982 | $84,057 | $30,846 | $25,227 | $78,438 | $54,904 | $32,813 |
| Depreciation and amortization . . . . . . . . . . . . . . | $7,351 | $5,672 | $2,145 | $1,454 | $4,981 | $3,136 | $1,663 |
| General and administrative | $6,766 | $6,645 | $2,210 | $1,773 | $6,208 | $4,471 | $3,328 |
| Impairment of long-lived assets . . . . . . . . . . . . | -- | $1,120 | -- | -- | $1,120 | -- | -- |
| Total operating expenses . . . . . . . . . | $113,099 | $97,494 | $35,201 | $28,454 | $90,747 | $62,551 | $37,804 |
| Operating income (loss) | $7,968 | $3,014 | $2,602 | $1,941 | $2,368 | $200 | ($3,370) |

| Other income (expense): | | | | | | | |
|---|---|---|---|---|---|---|---|
| Interest expense, net . . . . . . . . . . . . | ($2,210) | ($1,924) | ($719) | ($347) | ($1,552) | ($1,296) | ($404) |
| Equity in net income (loss) of affiliates (1) . . . . . . . . . . . . . . . . . . | ($3) | $90 | $57 | $29 | $62 | $206 | $284 |
| Loss on sale of investment in affiliate . . . . . . . . | -- | ($611) | -- | -- | ($611) | -- | -- |
| Total other income (expense) . . . . . | ($2,213) | ($2,445) | ($662) | ($318) | ($2,101) | ($1,090) | ($120) |
| Pretax income (loss) . . . . . . . . . . . . | $5,755 | $569 | $1,940 | $1,623 | $267 | ($890) | ($3,490) |
| Income tax expense . . . . . . . . . . . . . | $47 | $216 | $81 | $40 | $175 | -- | -- |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . | **$5,708** | $353 | $1,859 | $1,583 | $92 | ($890) | ($3,490) |
| Basic net income (loss) per common share . . . . | **$0.60** | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) | ($1.00) |
| Diluted net income (loss) per common share . . . | $0.59 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) | ($1.00) |
| Weighted average common shares outstanding . . . . . . . . . . . . . . . . . . . . . . . . . . | $9,536,631 | $9,305,408 | $9,305,408 | $9,305,408 | $9,305,408 | $4,909,894 | $3,496,570 |
| Weighted average common shares and share equivalents outstanding - - assuming dilution . . . . . . . . . . . . . . . . . . . . . | $9,668,469 | $9,315,139 | $9,326,642 | $9,315,307 | $9,305,408 | $4,909,894 | $3,496,570 |

81.    The statements quoted from Sabi on July 16, 1999 that "[t]his performance is the best in Roadhouse Grill's history and clearly demonstrates the success of our turnaround program;" "[t]he dramatic improvement in Roadhouse Grill's operating income is a wonderful testament to our efforts;" and the financial results for the fiscal year ended April 25, 1999, as set forth in paragraphs 76-78 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; and Defendants were overstating revenue.

38

Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP. They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly, manipulated earnings; and published the financial results of the Company while they were in possession of or had access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

82.     On August 25, 1999, Defendants issued a press release over the <u>Business Wire</u> reporting, "Roadhouse Grill Reports First Quarter of Fiscal Year 2000 Results; Revenues Increased 21% Operating Income Improved 19%." The press release stated:

> Roadhouse Grill, Inc. reported a 21% increase in total revenues to $35.2 million in the first quarter of fiscal year 2000 from $29.0 million in the comparable period in fiscal year 1999. Operating income rose 19% to $2.1 million in the first quarter from $1.8 million in the same period last year. Income was $1.2 million in the first quarter before the cumulative effect of a required change in accounting principle related to the treatment of unamortized pre-opening expenses of $1.2 million ($953,000 after tax or $0.10 per diluted share) versus $1.3 million last year. Diluted earnings per share before the cumulative effect of change in accounting principle in the first quarter of fiscal year 2000 amounted to $0.12 versus $0.13 in the same period of fiscal year 1999. Same store sales for the quarter increased 1.0% over the prior year period.

> The effective income tax rate for the first quarter of fiscal year 2000 was 22% versus approximately a 3% effective rate for the same period in 1999. The impact of this significant increase in income tax rates was the primary reason that diluted earnings per share before the cumulative effect of change in accounting principle declined slightly in the quarter compared to the same period in the prior year.

Sabi also stated in the press release:

"We continue to diligently pursue increased operating
efficiencies and performance that will result in improved same
store sales and better operating margins."

***

"We believe that we have the financial resources to sustain this
growth without sacrificing operating results."

83.     Sabi's statements and the financial results for the fiscal quarter ended July 25,

1999, as set forth in paragraph 82 above, were knowingly or with severe recklessness

misstated by Defendants and were materially misleading as evidenced by the restatement of

the Company's financial statements for this period set forth in the paragraphs 86-87 below.  In

fact, Defendants knew or were severely reckless in not knowing that these financial statements

were not prepared in conformity with GAAP and contained serious accounting errors.  As

alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in

sworn deposition testimony that the General Ledger had not been reconciled for years; the

Company was not keeping its books in accordance with GAAP; and Defendants were

overstating revenue.  Defendants knew or were severely reckless in not knowing, of a number

of red flags and warning signs of improprieties that would have alerted them to the fact that

the Company's financial statements were not being prepared in conformity with GAAP.  They

knew or were severely reckless in not knowing that the Company's general accounts were not

properly reconciled and that the Company had woefully deficient internal accounting controls;

directly or indirectly, manipulated earnings; and published the financial results of the

Company while they were in possession of or had access to facts suggesting that the

statements were inaccurate, misleading, or incomplete.

84.     On September 7, 1999, Defendants filed the Company's Report on Form 10-Q

with the SEC that stated the Company's financial results for the quarter ended July 25, 1999.

The Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the
> thirteen weeks ended July 25, 1999 and July 26, 1998 are unaudited and reflect
> all adjustments (consisting of normal recurring adjustments) which are, in the
> opinion of management, necessary for a fair presentation of the financial
> statements for the interim periods.  The financial statements should be read in
> conjunction with the notes to consolidated financial statements included herein,
> together with management's discussion and analysis of financial condition and
> results of operations, contained in the Company's Annual Report on Form
> 10-K for the fifty-two weeks ended April 25, 1999 ("fiscal year 1999").

* * *

> Total revenues increased $6.2 million, or 21.3%, from $29.0 million for the
> fiscal year 1999 first quarter to $35.2 million for the fiscal year 2000 first
> quarter.  This increase is primarily attributable to sales generated at the nine
> new restaurants opened by the Company since the end of the fiscal year 1999
> first quarter.  Sales at comparable stores for the fiscal year 2000 first quarter
> increased 1% compared with sales in the fiscal year 1999 first quarter.  This
> was due in part to the Company's advertising campaign that was implemented
> in January 1999.

85.     The Company filed the following financial results in the above filing:

|  | Thirteen Weeks Ended | |
| --- | --- | --- |
|  | July 25, 1999 | July 26, 1998 |
| Total revenue ............................... | $35,232 | $29,040 |
| Cost of restaurant sales: |  |  |
| Food and beverage ............................. | $11,744 | $9,608 |
| Labor and benefits ............................. | $10,014 | $8,233 |
| Occupancy and other ........................... | $7,180 | $5,728 |
| Pre-opening amortization ........................ | $47 | $363 |
| Total cost of restaurant sales ........................ | $28,985 | $23,932 |

41

| | | |
|---|---|---|
| Depreciation and amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,012 | $1,717 |
| General and administrative expenses . . . . . . . . . . . . . . . . . . . . . . | $2,134 | $1,631 |
|     Total operating expenses . . . . . . . . . . . . . . . . . . . . . . . . . . | $33,131 | $27,280 |
|     Operating income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,101 | $1,760 |
| Other income (expense): | | |
|     Interest expense, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($581) | ($497) |
|     Equity in net income of affiliates . . . . . . . . . . . . . . . . . . . . | -- | $32 |
|     Total Other (expense) . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($581) | ($465) |
|     Income before taxes and cumulative effect of change in accounting principle . . . . . . . . . . . . . . . | $1,520 | $1,295 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $334 | $35 |
|     Income before cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . | $1,186 | $1,260 |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) . . . . . . . . . . . . . . . . . . . . . . . . . | ($953) | -- |
| Net income . . . . . . . . . . . . . | $233 | $1,260 |
| Basic net income per common share: | | |
|     Basic income before cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . | $0.12 | $0.14 |
|     Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($0.10) | -- |
| Basic Net income per common share . . . . . . . . . . . . . . . . . . . . . . . . | $0.02 | $0.14 |
| Diluted net income per common share: | | |
|     Diluted income before cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . | $0.12 | $0.13 |
|     Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($0.10) | -- |
| Diluted net income per common share . . . . . . . . . . . . . . . . . . . . . . . . | $0.02 | $0.13 |
| Weighted average common shares outstanding . . . . . . . . . . . . . . . . . | $9,708,741 | $9,308,411 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . . . . . . | $9,874,688 | $9,523,738 |

86.     However on August 14, 2001, the Company restated those same financial

results.  In fact, the Company restated its financial statements for the fiscal years ended 1999

and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual

Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

     87.    The restated financials are:

|  | Thirteen Weeks Ended | |
| --- | --- | --- |
|  | July 25, 1999 | July 26, 1998 |
|  | (As restated) | (As restated) |
| Total revenue | $35,316 | $29,133 |
| Cost of restaurant sales: | | |
|     Food and beverage | $12,045 | $9,891 |
|     Labor and benefits | $9,986 | $8,233 |
|     Occupancy and other | $6,935 | $5,572 |
|     Pre-opening expenses | $47 | $363 |
|     Total cost of restaurant sales | $29,013 | $24,059 |
| Depreciation and amortization | $2,061 | $1,717 |
| General and administrative expenses | $2,131 | $1,631 |
|     Total operating expenses | $33,205 | $27,407 |
|     Operating income | $2,111 | $1,726 |
| Other income (expense): | | |
|     Interest expense, net | ($581) | ($497) |
|     Equity in net income (loss) of affiliates | -- | $32 |
|     Total Other (expense) | ($581) | ($465) |
|     Income before taxes and cumulative effect of change in accounting principle | $1,530 | $1,261 |
| Income tax expense | $27 | $10 |
|     Income before cumulative effect of change in accounting principle | $1,503 | $1,251 |
| Cumulative effect of change in accounting principle (net of tax benefit of $248) | ($877) | -- |
| Net income | $626 | $1,251 |

| | | |
|---|---|---|
| Basic net income per common share: | | |
| Basic income before cumulative effect of change in accounting principle .................... | $0.15 | $0.13 |
| Cumulative effect of change in accounting principle ........................... | ($0.09) | -- |
| Basic Net income per common share ......................... | $0.06 | $0.13 |
| Diluted net income per common share: | | |
| Diluted income before cumulative effect of change in accounting principle ..................... | $0.15 | $0.13 |
| Cumulative effect of change in accounting principle ........................... | ($0.09) | -- |
| Diluted net income per common share ......................... | $0.06 | $0.13 |
| Weighted average common shares outstanding ................. | $9,708,741 | $9,308,411 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution ............................ | $9,874,688 | $9,523,738 |

88.     The financial results for the fiscal quarter ended July 25, 1999, as set forth in paragraphs 84-85 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; and Defendants were overstating revenue. Defendants knew or were severely reckless in not knowing of a number of red flags and

44

warning signs of improprieties that would have alerted them to the fact that the Company's

financial statements were not being prepared in conformity with GAAP.  They knew or were

severely reckless in not knowing that the Company's general accounts were not properly

reconciled and that the Company had woefully deficient internal accounting controls; directly

or indirectly, manipulated earnings; and published the financial results of the Company while

they were in possession of or had access to facts suggesting that the statements were

inaccurate, misleading, or incomplete.

     89.     On December 1, 1999, Defendants issued a press release over the <u>Business</u>

<u>Wire</u> reporting:

> Roadhouse Grill, Inc. reported a 15% increase in total revenues to $32.3 million in the second quarter of fiscal year 2000 from $28.2 million in the comparable period in fiscal year 1999. Operating income amounted to $326,000 in the second quarter versus $1.6 million in the same period last year. The Company reported a net loss of $212,000 for the second quarter versus a net profit of $904,000 last year. Diluted earnings per share in the second quarter of fiscal year 2000 amounted to a loss of $0.02 versus a $0.10 profit in the same period of fiscal year 1999. Same store sales for the quarter decreased 3.2% from the prior year period.

> Revenues for the first half of fiscal year 2000 increased 18% to $67.6 million from $57.2 million for the same period of the prior year. Operating income for the first half of the current year amounted to $2.4 million versus $3.3 million a year ago for the same period. Net income amounted to $974,000 for the first half of fiscal year 2000 before the cumulative effect of a required change in accounting principle related to the treatment of unamortized pre-opening expenses of $1.2 million ($953,000 after tax or $0.10 per diluted share) versus $2.2 million for the same period of last year. Diluted earnings per share before the cumulative effect of the change in accounting principle in the first half of the current year amounted to $0.10 versus $0.23 in the same period of fiscal year 1999.

90.     On December 8, 1999, Defendants filed the Company's Report on Form 10-Q

with the SEC that stated the Company's financial results for the fiscal quarter ended October

24, 1999.  The Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the
> thirteen weeks and twenty-six weeks ended October 24, 1999 and October 25,
> 1998, are unaudited and reflect all adjustments (consisting of normal recurring
> adjustments) which are, in the opinion of management, necessary for a fair
> presentation of the financial statements for the interim periods.  The financial
> statements should be read in conjunction with the notes to consolidated
> financial statements included herein, together with management's discussion
> and analysis of financial condition and results of operations, contained in the
> Company's Annual Report on Form 10-K for the fifty-two weeks ended April
> 25, 1999 ("fiscal year 1999").
>
>                     * * *
>
> Total revenues increased $4.2 million, or 14.7%, from $28.2 million for the
> fiscal year 1999 second quarter to $32.3 million for the fiscal year 2000 second
> quarter.

91.     The Company filed the following financial results in the above filing:

|  | Thirteen Weeks Ended | | Twenty-Six Weeks Ended | |
|---|---|---|---|---|
|  | October 24, 1999 | October 25, 1998 | October 24, 1999 | October 25, 1998 |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $32,331 | $28,181 | $67,563 | $57,221 |
| Cost of restaurant sales: |  |  |  |  |
|     Food and beverage . . . . . . . . . . . . . . . . . . . | $10,997 | $9,431 | $22,741 | $19,039 |
|     Labor and benefits . . . . . . . . . . . . . . . . . . . | $9,413 | $8,058 | $19,427 | $16,291 |
|     Occupancy and other . . . . . . . . . . . . . . . . . | $7,054 | $5,214 | $14,234 | $10,942 |
|     Pre-opening expenses . . . . . . . . . . . . . . . . . | $529 | $367 | $576 | $730 |
|     Total cost of restaurant sales . . . . . . . . . . . . | $27,993 | $23,070 | $56,978 | $47,002 |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . | $2,032 | $1,839 | $4,044 | $3,556 |
| General and administrative expenses . . . . . . . . . . . . . . | $1,980 | $1,698 | $4,114 | $3,329 |
|     Total operating expenses . . . . . . . . . . . . . . . | $32,005 | $26,607 | $65,136 | $53,887 |
|     Operating income . . . . . . . . . . . . . . . . . . . . | $326 | $1,574 | $2,427 | $3,334 |

| | | | | |
|---|---|---|---|---|
| Other income (expense): | | | | |
| Interest expense, net . . . . . . . . . . . . . . . . . | ($596) | ($585) | ($1,177) | ($1,082) |
| Equity in net (loss) of affiliates . . . . . . . . . . | -- | ($35) | -- | ($3) |
| Total other (expense) . . . . . . . . . . . . . . . . | ($596) | ($620) | ($1,177) | ($1,085) |
| Income (loss) before taxes and cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . | ($270) | $954 | $1,250 | $2,249 |
| Income tax expense (benefit) | ($58) | $50 | $276 | $84 |
| Income (loss) before cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . | ($212) | $904 | $974 | $2,165 |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) . . . . . . . . . . . . . . | -- | -- | ($953) | -- |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . | ($212) | $904 | $21 | $2,165 |
| Basic net income (loss) per common share: | | | | |
| Basic income (loss) before cumulative effect of change in accounting principle . . . . . . . . | ($0.02) | $0.10 | $0.10 | $0.23 |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . | -- | -- | ($0.10) | -- |
| Basic net income (loss) per common share . . . . . . . . . . | ($0.02) | $0.10 | $0.00 | $0.23 |
| Diluted net income per common share: | | | | |
| Diluted income before cumulative effect of change in accounting principle . . . . . . . . . . | ($0.02) | $0.10 | $0.10 | $0.23 |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . | -- | -- | ($0.10) | -- |
| Diluted net income (loss) per common share . . . . . . . . | ($0.02) | $0.10 | $0.00 | $0.23 |
| Weighted-average common shares outstanding . . . . . . | $9,708,741 | $9,423,027 | $9,708,741 | $9,365,719 |
| Weighted-average common shares and share equivalents outstanding - assuming dilution . . . . . . . . . . . . . . . . . . . . . . . . . . | $9,708,741 | $9,486,874 | $9,836,081 | $9,507,768 |

92.     However on August 14, 2001, the Company restated those same financial

results.  In fact, the Company restated its financial statements for the fiscal years ended 1999

and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual

Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April

25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

93.    The restated financials are:

| | Thirteen Weeks Ended | | Twenty-Six Weeks Ended | |
| --- | --- | --- | --- | --- |
| | October 24, 1999 | October 25, 1998 | October 24, 1999 | October 25, 1998 |
| Total revenue | $32,457 | $28,282 | $67,773 | $57,416 |
| Cost of restaurant sales: | | | | |
| Food and beverage | $11,276 | $9,690 | $23,322 | $19,582 |
| Labor and benefits | $9,413 | $8,058 | $19,400 | $16,291 |
| Occupancy and other | $7,117 | $5,090 | $14,051 | $10,662 |
| Pre-opening expenses | $529 | $367 | $576 | $731 |
| Total cost of restaurant sales | $28,335 | $23,205 | $57,349 | $47,266 |
| Depreciation and amortization | $2,032 | $1,839 | $4,093 | $3,556 |
| General and administrative expenses | $1,980 | $1,698 | $4,114 | $3,329 |
| Total operating expenses | $32,347 | $26,742 | $65,556 | $54,151 |
| Operating income | $110 | $1,540 | $2,217 | $3,265 |
| Other income (expense): | | | | |
| Interest expense, net | ($596) | ($585) | ($1,177) | ($1,082) |
| Equity in net (loss) of affiliates | -- | ($35) | -- | ($3) |
| Total other (expense) | ($596) | ($620) | ($1,177) | ($1,085) |
| Income (loss) before taxes and cumulative effect of change in accounting principle | ($486) | $920 | $1,040 | $2,180 |
| Income tax expense (benefit) | ($13) | $8 | $10 | $17 |
| Income (loss) before cumulative effect of change in accounting principle | ($473) | $912 | $1,030 | $2,163 |
| Cumulative effect of change in accounting principle (net of tax benefit of $248) | --- | -- | ($877) | -- |
| Net income (loss) | ($473) | $912 | $153 | $2,163 |
| Basic net income (loss) per common share: | | | | |
| Basic income (loss) before cumulative effect of change in accounting principle | ($0.05) | $0.10 | $0.11 | $0.23 |

48

| | | | | |
|---|---|---|---|---|
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . | -- | -- | $(0.09) | -- |
| Basic net income (loss) per common share . . . . . . . . . | ($0.05) | $0.10 | $0.02 | $0.23 |
| Diluted net income (loss) per common share: | | | | |
| Diluted income (loss) before cumulative effect of change in accounting principle . . . . . . . . . . . | ($0.05) | $0.10 | $0.11 | $0.23 |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . | -- | -- | ($0.09) | -- |
| Diluted net income (loss) per common share . . . . . . . . | ($0.05) | $0.10 | $0.02 | $0.23 |
| Weighted-average common shares outstanding . . . . . . | $9,708,741 | $9,423,027 | $9,708,741 | $9,365,719 |
| Weighted-average common shares and share equivalents outstanding - assuming dilution . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $9,708,741 | $9,486,874 | $9,836,081 | $9,507,768 |

94.    The financial results for the fiscal quarter ended October 24, 1999, as set forth in paragraphs 89-91 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; and Defendants were overstating revenue. Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's

financial statements were not being prepared in conformity with GAAP. They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly, manipulated earnings; and published the financial results of the Company while they were in possession of or had access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

95.     On March 2, 2000, Defendants issued a press release over the <u>Business Wire</u> reporting the Company's financial results for the third quarter of fiscal year 2000. The release stated:

> Roadhouse Grill, Inc. reported a 25% increase in total revenues to $35.8 million in the third quarter of fiscal year 2000 from $28.7 million in the comparable period in fiscal year 1999. Operating income amounted to $806,000 in the third quarter versus $2.3 million in the same period last year. The Company reported net income of $204,000 for the third quarter versus net income of $1.7 million last year. Diluted earnings per share in the third quarter of fiscal year 2000 amounted to $0.02 versus a $0.18 in the same period of fiscal year 1999. . . .

> Revenues for the first 39 weeks of fiscal year 2000 increased 20% to $103.4 million from $86.0 million for the same period of the prior year. Operating income for the first 39 weeks of the current year amounted to $3.2 million versus $5.6 million a year ago for the same period. Net income amounted to $1.2 for the first 39 weeks of fiscal year 2000 before the cumulative effect of a required change in accounting principle related to the treatment of unamortized pre-opening expenses of $1.2 million ($953,000 after tax or $0.10 per diluted share) versus $3.9 million for the same period of last year. Diluted earnings per share before the cumulative effect of the change in accounting principle in the first 39 weeks of the current year amounted to $0.12 versus $0.40 in the same period of fiscal year 1999.

96.     On March 8, 2000, Defendants filed the Company's Report on Form 10-Q with the SEC that set forth the Company's financial results for the fiscal quarter ended January 23, 2000.  The Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the thirteen weeks and thirty-nine weeks ended January 23, 2000 and January 24, 1999, are unaudited and reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management, necessary for a fair presentation of the financial statements for the interim periods.  The financial statements should be read in conjunction with the notes to consolidated financial statements included herein, together with management's discussion and analysis of financial condition and results of operations, contained in the Company's Annual Report on Form 10-K for the fifty-two weeks ended April 25, 1999 ("fiscal year 1999").

* * *

> Total revenues increased $7.1 million, or 24.7%, from $28.7 million for the fiscal year 1999 third quarter to $35.8 million for the fiscal year 2000 third quarter.  This increase is primarily attributable to sales generated at the 15 new restaurants opened by the Company since the end of the fiscal year 1999 third quarter and the inclusion of 100% of sales from North Palm Beach this current fiscal quarter.  Sales at comparable stores for the fiscal year 2000 third quarter decreased 2.8% compared with sales in the fiscal year 1999 third quarter.  The average number of restaurants included in the same store sales base for the fiscal year 2000 third quarter was 45.

97.     The Company filed the following financial results in the above filing:

| | Thirteen Weeks Ended | | Thirty-Nine Weeks Ended | |
| --- | --- | --- | --- | --- |
| | January 23, 2000 | January 24, 1999 | January 23, 2000 | January 24, 1999 |
| Total revenue | $35,842 | $28,749 | $103,405 | $85,970 |
| Cost of restaurant sales: | | | | |
| Food and beverage | $11,871 | $9,236 | $34,612 | $28,275 |
| Labor and benefits | $10,707 | $8,100 | $30,134 | $24,391 |
| Occupancy and other | $7,657 | $5,288 | $21,891 | $16,230 |

| | | | | |
|---|---|---|---|---|
| Pre-opening expenses . . . . . . . . . . . . . . . . . . . | $749 | $298 | $1,325 | $1,028 |
| Total cost of restaurant sales . . . . . . . . . . . . . . | $30,984 | $22,922 | $87,962 | $69,924 |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . | $2,162 | $1,894 | $6,206 | $5,450 |
| General and administrative expenses . . . . . . . . . . . . . . . . | $1,890 | $1,623 | $6,004 | $4,952 |
| Total operating expenses . . . . . . . . . . . . . . . . . | $35,036 | $26,439 | $100,172 | $80,326 |
| Operating income . . . . . . . . . . . . . . . . . . . . . | $806 | $2,310 | $3,233 | $5,644 |
| Other income (expense): | | | | |
| Interest expense, net . . . . . . . . . . . . . . . . . . . | ($544) | ($544) | ($1,721) | ($1,626) |
| Equity in net (loss) of affiliates . . . . . . . . . . . . | -- | -- | -- | ($3) |
| Total other (expense) . . . . . . . . . . . . . . . . . | ($544) | ($544) | ($1,721) | ($1,629) |
| Income before taxes and cumulative effect of change in accounting principle . . . . . . | $262 | $1,766 | $1,512 | $4,015 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . | $58 | $50 | $334 | $134 |
| Income before cumulative effect of change in accounting principle . . . . . . . . . . . . | $204 | $1,716 | $1,178 | $3,881 |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) . . . . . . . . . . . . . . . | -- | -- | ($953) | -- |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . | $204 | $1,716 | $225 | $3,881 |
| Basic net income per common share: | | | | |
| Basic income before cumulative effect of change in accounting principle . . . . . . . . . . . . . | $0.02 | $0.18 | $0.12 | $0.41 |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . | -- | -- | ($0.10) | -- |
| Basic Net income per common share . . . . . . . . . . . . . . | $0.02 | $0.18 | $0.02 | $0.41 |
| Diluted net income per common share: | $0.02 | $0.18 | $0.12 | $0.40 |
| Diluted income before cumulative effect of change in accounting principle . . . . . . | | | | |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . | -- | -- | ($0.10) | -- |
| Diluted net income per common share . . . . . . . . . . . . . . | $0.02 | $0.18 | $0.02 | $0.40 |
| Weighted average common shares outstanding . . . . . . . . | $9,708,741 | $9,708,741 | $9,708,741 | $9,480,894 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . | $9,779,825 | $9,801,463 | $9,787,751 | $9,606,097 |

98.     However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

99.     The restated financials are:

|  | Thirteen Weeks Ended | | Thirty-Nine Weeks Ended | |
|---|---|---|---|---|
|  | January 23, 2000 | January 24, 1999 | January 23, 2000 | January 24, 1999 |
|  | (As restated) | (As restated) | (As restated) | (As restated) |
| Total revenue .................................. | $35,917 | $28,846 | $103,690 | $86,261 |
| Cost of restaurant sales: |  |  |  |  |
| Food and beverage ...................... | $12,171 | $9,486 | $35,492 | $29,067 |
| Labor and benefits ...................... | $10,707 | $8,100 | $30,106 | $24,391 |
| Occupancy and other ................... | $7,709 | $5,178 | $21,763 | $15,840 |
| Pre-opening expenses ................... | $749 | $298 | $1,325 | $1,028 |
| Total cost of restaurant sales ............... | $31,336 | $23,062 | $88,686 | $70,326 |
| Depreciation and amortization ...................... | $2,162 | $1,894 | $6,254 | $5,450 |
| General and administrative expenses ................ | $1,890 | $1,623 | $6,004 | $4,952 |
| Total operating expenses .................. | $35,388 | $26,579 | $100,944 | $80,728 |
| Operating income ........................ | $529 | $2,267 | $2,746 | $5,533 |
| Other income (expense): |  |  |  |  |
| Interest expense, net ...................... | ($544) | ($544) | ($1,721) | ($1,626) |
| Equity in net (loss) of affiliates ............. | -- | -- | -- | ($3) |
| Total other (expense) .................... | ($544) | ($544) | ($1,721) | ($1,629) |
| Income (loss) before taxes and cumulative effect of change in accounting principle ...... | ($15) | $1,723 | $1,025 | $3,904 |
| Income tax expense ..................... | $0 | $14 | $10 | $32 |
| Income(loss) before cumulative effect of change in accounting principle ..................... | ($15) | $1,709 | $1,015 | $3,872 |

53

| | | | | |
|---|---|---|---|---|
| Cumulative effect of change in accounting principle (net of tax benefit of $248) ................ | -- | -- | ($877) | -- |
| Net income (loss) ................................. | ($15) | $1,709 | $138 | $3,872 |
| Basic net income per common share: | -- | $0.18 | $0.10 | $0.41 |
|     Basic income (loss) before cumulative effect of change in accounting principle ............ | | | | |
|     Cumulative effect of change in accounting principle ...................... | -- | -- | ($0.09) | -- |
| Basic Net income (loss) per common share ............ | -- | $0.18 | $0.01 | $0.41 |
| Diluted net income per common share: | | | | |
|     Diluted income (loss) before cumulative effect of change in accounting principle ...... | -- | $0.17 | $0.10 | $0.40 |
|     Cumulative effect of change in accounting principle ................... | -- | -- | ($0.09) | -- |
| Diluted net income per common share ................ | -- | $0.17 | $0.01 | $0.40 |
| Weighted average common shares outstanding ......... | $9,708,741 | $9,708,741 | $9,708,741 | $9,480,894 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution ...................... | $9,779,825 | $9,801,463 | $9,787,751 | $9,606,097 |

100.    The financial results for the fiscal quarter ended January 23, 2000, as set forth in paragraphs 95-97 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not

54

keeping its books in accordance with GAAP; and Defendants were overstating revenue. Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP. They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly, manipulated earnings; and published the financial results of the Company while they were in possession of or had access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

101.    On June 19, 2000, the Company released its financial results for the fourth quarter of fiscal year 2000, in a press release over the <u>Business Wire</u>, which reported:

> Roadhouse Grill, Inc. reported a 30% increase in total revenues to $45.1 million in the fourth quarter of fiscal year 2000 from $34.7 million in the comparable period in fiscal year 1999. The fourth quarter of fiscal year 2000 consisted of 14 weeks compared to a 13-week fourth quarter in fiscal year 1999. Operating income amounted to $4.3 million in the fourth quarter of fiscal year 2000, a 54% increase over operating income of $2.8 million in the same period last year. The Company reported net income of $3.3 million for the fourth quarter versus net income of $2.1 million last year. Diluted earnings per share in the fourth quarter of fiscal year 2000 amounted to $0.34 versus $0.22 in the same period of fiscal year 1999. . . .
>
> Revenues for fiscal year 2000 increased 23% to $148.5 million from $120.7 million in fiscal year 1999. Fiscal year 2000 consisted of 53 weeks compared to a 52-week year in fiscal year 1999. Operating income for the current year amounted to $ 7.6 million versus $8.5 million in fiscal year 1999. Net income amounted to $4.5 for fiscal year 2000 before the cumulative effect of a required change in accounting principle related to the treatment of unamortized pre-opening expenses of $1.2 million ($953,000 after tax or $0.10 per diluted share) versus $6.0 million in fiscal year 1999. Diluted earnings per share before the cumulative effect of the change in accounting principle in fiscal year 2000

amounted to $0.46 versus $0.62 for the prior year. Same store sales for fiscal year 2000 decreased 2.3% from the prior year.

102.    On August 31, 2000, Defendants filed the Company's Amended Annual Report on Form 10-K with the SEC that reported the Company's financial results for the fiscal year ended April 30, 2000.  The Annual Report on Form 10-K stated, in pertinent part, as follows:

> Total revenues increased $27.8 million, or 23.0%, to $148.5 million for fiscal year 2000 from $120.7 million for fiscal year 1999.  This increase is primarily attributable to sales generated at the 15 new restaurants opened by the Company since the end of fiscal year 1999 and the full year operations of the 12 new restaurants opened in fiscal year 1999 that were open and operating only partially during fiscal year 1999.  At the end of fiscal year 2000, the Company operated 35 Company-owned restaurants in Florida.  A restaurant is considered comparable after its first 18 months of operation.

103.    The Company filed the following financial results in the above filing:

(UNAUDITED)

|  | FISCAL 2000 | FISCAL 1999 | (Unaudited) Fiscal 1998 | 17 Weeks Ended April 26, 1998 | 17 Weeks Ended April 27, 1997 | FISCAL 1997 | FISCAL 1996 |
|---|---|---|---|---|---|---|---|
| STATEMENT OF OPERATIONS DATA: |  |  |  |  |  |  |  |
| Total revenue | $148,495 | $120,681 | $100,194 | $37,684 | $30,285 | $92,795 | $62,433 |
| Cost of restaurant sales: |  |  |  |  |  |  |  |
| Food and beverage | $48,710 | $39,505 | $33,065 | $12,130 | $10,056 | $30,991 | $21,382 |
| Labor and benefits | $43,201 | $33,897 | $29,232 | $10,340 | $8,957 | $27,849 | $19,748 |
| Occupancy and other | $29,879 | $23,776 | $19,938 | $7,856 | $5,495 | $17,577 | $12,747 |
| Pre-opening amortization | $2,387 | $1,318 | $1,822 | $520 | $719 | $2,021 | $1,027 |
| Total cost of restaurant sales | $124,177 | $98,496 | $84,057 | $30,846 | $25,227 | $78,438 | $54,904 |
| Depreciation and amortization | $8,510 | $7,351 | $5,672 | $2,145 | $1,454 | $4,981 | $3,136 |
| General and administrative expenses | $8,241 | $6,766 | $6,645 | $2,210 | $1,773 | $6,208 | $4,471 |
| Impairment of long-lived assets | -- | -- | $1,120 | -- | -- | $1,120 | -- |
| Total operating expenses | $140,928 | $112,613 | $97,494 | $35,201 | $28,454 | $90,747 | $62,511 |
| Operating income | $7,567 | $8,068 | $2,700 | $2,483 | $1,831 | $2,048 | ($78) |

56

| Other income (expense): | | | | | | | |
|---|---|---|---|---|---|---|---|
| Interest expense, net . . . . . . . . . . . . | ($2,301) | ($2,210) | ($1,924) | ($719) | ($347) | ($1,552) | ($1,296) |
| Equity in income (loss) of affiliates (1) . . . . . . . . . . . . . . . . . . . | -- | ($3) | $90 | $57 | $29 | $62 | $206 |
| Other, net | -- | $386 | $314 | $119 | $110 | $320 | $278 |
| Loss on sale of investment in affiliate . . . . | -- | -- | ($611) | -- | -- | ($611) | -- |
| Total other  (expense) . . . . . . . . . . | ($2,301) | ($1,827) | ($2,131) | ($543) | ($208) | ($1,781) | ($812) |
| Income (loss) before income taxes and cumulative effect of change in account principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $5,266 | $6,241 | $569 | $1,940 | $1,623 | $267 | ($890) |
| Income tax expense . . . . . . . . . . . . . | $801 | $233 | $216 | $81 | $40 | $175 | -- |
| Income (loss) before cumulative change in accounting principle . . . . . . . . . . . . . . . . . . . | **$4,465** | $6,008 | $353 | $1,859 | $1,623 | $92 | ($890) |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) . . . . . . | **($953)** | -- | -- | -- | -- | -- | -- |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . | **$3,512** | $6,008 | $353 | $1,859 | $1,583 | $92 | ($890) |
| Basic net income (loss) per common share: | **$0.46** | $0.62 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) |
| Basic income before cumulative effect of change in accounting principle . . . . . . . | | | | | | | |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . . | ($0.10) | -- | -- | -- | -- | -- | -- |
| Diluted net income (loss) per common share: | $0.46 | $0.62 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) |
| Diluted income before cumulative effect of change in accounting principle | ($0.10) | -- | -- | -- | -- | -- | -- |
| Diluted net income (loss) per common share | $0.36 | $0.62 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) |
| Weighted average common shares outstanding . . . . . . . . . . . . . . . . . . . . . . | $9,708.741 | $9,536,631 | $9,305,408 | $9,305,408 | $9,305,408 | $9,305,408 | $4,909,894 |
| Weighted average common shares and share equivalents outstanding - - assuming dilution . . . . . . . . . . . . . . . . . . . . | $9,792,019 | $9,668,469 | $9,315,139 | $9,326,642 | $9,315,307 | $9,305,408 | $4,909,894 |
| **Balance Sheet Data:** | | | | | | | |
| Working capital (deficit) | ($15,931) | ($5.586) | ($5,864) | ($5,864) | ($10,776) | ($5,886) | ($5,605) |
| Total assets | $105,312 | $91,283 | $80,109 | $80,109 | $67,943 | $75,432 | $67,335 |
| Long-term debt and due to related parties, including current portion | $25,661 | $19,505 | $19,095 | $19,095 | $12,850 | $18,115 | $13,657 |
| Obligation under capital leases, including current portion | $6,479 | $11,933 | $7,542 | $7,542 | $4.186 | $7,908 | $4,271 |
| Total shareholders' equity | $54,189 | $50,677 | $43,154 | $43,154 | $42,705 | $41,295 | $41,100 |

57

104.    However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

105.    The restated financials are:

|  | | | (UNAUDITED) | | | | |
| STATEMENT OF OPERATIONS DATA | FISCAL 2000 | FISCAL 1999 | (Unaudited) Fiscal 1998 (1) | 17 Weeks Ended April 26, 1998 (1) | 17 Weeks Ended April 27, 1997 (1) | FISCAL 1997 (1) | FISCAL 1996 (1) |
|  | (As restated) | (As restated) | | | | | |
| Total revenue | $148,897 | $121,067 | $100,508 | $37,803 | $30,395 | $93,115 | $62,711 |
| Cost of restaurant sales: | | | | | | | |
| Food and beverage | $50,268 | $40,606 | $34,002 | $12,487 | $10,360 | $31,876 | $22,045 |
| Labor and benefits | $43,512 | $33,969 | $29,232 | $10,340 | $8,957 | $27,849 | $19,748 |
| Occupancy and other | $30,067 | $23,089 | $19,001 | $7,499 | $5,191 | $16,692 | $12,084 |
| Pre-opening expenses | $2,387 | $1,318 | $1,822 | $520 | $719 | $2,021 | $1,027 |
| Total cost of restaurant sales | $126,234 | $98,982 | $84,057 | $30,846 | $25,227 | $78,438 | $54,904 |
| Depreciation and amortization | $8,560 | $7,351 | $5,672 | $2,145 | $1,454 | $4,981 | $3,136 |
| General and administrative expenses | $8,251 | $6,766 | $6,645 | $2,210 | $1,773 | $6,208 | $4,471 |
| Impairment of long-lived assets | -- | -- | $1,120 | -- | -- | $1,120 | -- |
| Total operating expenses | $143,035 | $113,099 | $97,494 | $35,201 | $28,454 | $90,747 | $62,511 |
| Operating income | $5,862 | $7,968 | $3,014 | $2,602 | $1,941 | $2,368 | $200 |
| Other income (expense): | | | | | | | |
| Interest expense, net | ($2,301) | ($2,210) | ($1,924) | ($719) | ($347) | ($1,552) | ($1,296) |
| Equity in income (loss) of affiliates (1) | -- | ($3) | $90 | $57 | $29 | $62 | $206 |
| Loss on sale of investment in affiliate | -- | -- | ($611) | -- | -- | ($611) | -- |

58

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total other (expense) ........... | ($2,301) | ($2,213) | ($2,445) | ($662) | ($318) | ($2,101) | ($1,090) |
| Income (loss) before income taxes and cumulative effect of change in account principle ............................ | $3,561 | $5,755 | $569 | $1,940 | $1,623 | $267 | ($890) |
| Income tax expense ............. | $78 | $47 | $216 | $81 | $40 | $175 | -- |
| Income (loss) before cumulative change in accounting principle ................... | **$3,483** | $5,708 | $353 | $1,859 | $1,583 | $92 | ($890) |
| Cumulative effect of change in accounting principle (net of tax benefit of $248) ....... | **($877)** | -- | -- | -- | -- | -- | -- |
| Net income (loss) ...................... | **$2,606** | $5,708 | $353 | $1,859 | $1,583 | $92 | ($890) |
| Basic net income (loss) per common share: | **$0.36** | $0.60 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) |
| Basic income before cumulative effect of change in accounting principle ....... | | | | | | | |
| Cumulative effect of change in accounting principle .................... | ($0.90) | -- | -- | -- | -- | -- | -- |
| Basic net income (loss) per common share .... | $0.27 | $0.60 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) |
| Diluted net income (loss) per common share: | $0.36 | $0.59 | $0.04 | $0.20 | $0.17 | $0.01 | ($0.18) |
| Diluted income before cumulative effect of change in accounting principle ........... | | | | | | | |
| Cumulative effect of change in accounting principle ............................ | ($0.09) | -- | -- | -- | -- | -- | -- |
| Diluted net income (loss) per common share: | $   0.27 | $   0.59 | $   0.04 | $   0.20 | $   0.17 | $  0.01 | $ (0.18) |
| Weighted average common shares outstanding ............................ | $9,708,741 | $9,536,631 | $9,305,408 | $9,305,408 | $9,305,408 | $9,305,408 | $4,909,894 |
| Weighted average common shares and share equivalents outstanding -- assuming dilution ..................... | $9,792,019 | $9,668,469 | $9,315,139 | $9,326,642 | $9,315,307 | $9,305,408 | $4,909,894 |

106.     The financial results for the fiscal year ended April 30, 2000, as set forth in

paragraphs101-103 above, were knowingly or with severe recklessness misstated by

Defendants and were materially misleading as evidenced by the restatement of the Company's

financial statements for this period set forth in the preceding paragraph.  Defendants knew or

were severely reckless in not knowing that these financial statements were not prepared in

conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40-

51 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony

that the General Ledger had not been reconciled for years; the Company was not keeping its

59

books in accordance with GAAP; and Defendants were overstating revenue.  Defendants knew

or were severely reckless in not knowing of a number of red flags and warning signs of

improprieties that would have alerted them to the fact that the Company's financial statements

were not being prepared in conformity with GAAP.  They knew or were severely reckless in

not knowing that the Company's general accounts were not properly reconciled and that the

Company had woefully deficient internal accounting controls; directly or indirectly,

manipulated earnings; and published the financial results of the Company while they were in

possession of or had access to facts suggesting that the statements were inaccurate,

misleading, or incomplete.

107.    On September 13, 2000, Defendants filed the Company's report on Form 10-Q

with the SEC that stated the Company's financial results for the quarter ended July 30, 2000.

The Form 10-Q stated, in pertinent part, as follows:

> The financial statements of Roadhouse Grill, Inc. (the "Company") for the
> thirteen weeks ended July 30, 2000 and July 25, 1999 are unaudited and reflect
> all adjustments (consisting of normal recurring adjustments) which are, in the
> opinion of management, necessary for a fair presentation of the financial
> statements for the interim periods.  The financial statements should be read in
> conjunction with the notes to consolidated financial statements included herein,
> together with management's discussion and analysis of financial condition and
> results of operations, contained in the Company's Annual Report on Form
> 10-K for the fifty-three weeks ended April 30, 2000 ("fiscal year 2000").

* * *

> Total revenues increased $6.1 million, or 17.3%, from $35.2 million for the
> fiscal year 2000 first quarter to $41.3 million for the fiscal year 2001 first
> quarter.  This increase is primarily attributable to sales generated at the 19 new
> restaurants opened by the Company since the end of the fiscal year 2000 first
> quarter.  Sales at comparable stores for the fiscal year 2001 first quarter
> decreased 6.5% compared with sales in the fiscal year 2000 first quarter.  The

Company believes that this decrease is partially attributable to reduced marketing and advertising expenditures in the fiscal year 2001 first quarter as compared to the fiscal year 2000 first quarter. The Company has recently launched a radio advertising campaign for several media-efficient markets and plans to focus its marketing efforts in local store marketing campaigns.

108. The Company filed the following financial results in the above filing:

|  | Thirteen Weeks Ended | |
|  | July 30, 2000 | July 25, 1999 |
| --- | --- | --- |
| Total revenues | $41,137 | $35,232 |
| Cost of restaurant sales: | | |
| Food and beverage | $13,948 | $12,045 |
| Labor and benefits | $12,774 | $10,014 |
| Occupancy and other | $8,288 | $6,879 |
| Pre-opening amortization | $918 | $47 |
| Total cost of restaurant sales | $35,928 | $28,985 |
| Depreciation and amortization | $2,401 | $2,012 |
| General and administrative expenses | $2,686 | $2,134 |
| Total operating expenses | $41,015 | $33,131 |
| Operating income | $302 | $2,101 |
| Other expenses: | | |
| Interest expense, net | $668 | $581 |
| Income (loss) before taxes and cumulative effect of change in accounting principle | ($366) | $1,520 |
| Income tax expense (benefit) | ($136) | $334 |
| Income(loss) before cumulative effect of change in accounting principle | ($230) | $1,186 |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) | -- | ($953) |
| Net income (loss) | ($230) | $233 |
| Basic net income (loss) per common share: | | |
| Basic income(loss) before cumulative effect of change in accounting principle | ($0.02) | $0.12 |
| Cumulative effect of change in accounting principle | -- | ($0.10) |

| | | |
|---|---|---|
| Basic Net income (loss) per common share ..................... | ($0.02) | $0.02 |
| Diluted net income (loss) per common share: | | |
| Diluted income (loss) before cumulative effect of change in accounting principle ..................... | ($0.02) | $0.12 |
| Cumulative effect of change in accounting principle ..................... | -- | ($0.10) |
| Diluted net income (loss) per common share ..................... | ($0.02) | $0.02 |
| Weighted average common shares outstanding .................. | $9,708,741 | $9,708,741 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution ...................... | $9,708,741 | $9,874,688 |

109.    However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

110.    The restated financials are:

| | Thirteen Weeks Ended | |
|---|---|---|
| | July 30, 2000 | July 25, 1999 |
| | (As restated) | (As restated) |
| Total revenue ................................ | $41,420 | $35,316 |
| Cost of restaurant sales: | | |
| Food and beverage ............................. | $13,948 | $12,045 |
| Labor and benefits ............................. | $12,774 | $9,986 |
| Occupancy and other ........................... | $8,243 | $6,935 |
| Pre-opening amortization ........................ | $918 | $47 |
| Total cost of restaurant sales ..................... | $35,883 | $29,013 |
| Depreciation and amortization ..................... | $2,352 | $2,061 |
| General and administrative expenses ................. | $2,686 | $2,131 |
| Total operating expenses ...................... | $40,921 | $33,205 |

| | | |
|---|---|---|
| Operating income .................................. | $499 | $2,111 |
| Other income (expense): | | |
| Interest expense, net .............................. | $668 | $581 |
| Income (loss) before taxes and cumulative effect of change in accounting principle ............... | ($169) | $1,530 |
| Income tax expense (benefit) ........................... | ($58) | $27 |
| Income(loss) before cumulative effect of change in accounting principle ..................... | ($111) | $1,503 |
| Cumulative effect of change in accounting principle (net of tax benefit of $248) ......................... | -- | ($877) |
| Net income (loss) ................................... | ($111) | $626 |
| Basic net income (loss) per common share: | | |
| Basic income(loss) before cumulative effect of change in accounting principle ..................... | ($0.01) | $0.15 |
| Cumulative effect of change in accounting principle ............................. | -- | ($0.09) |
| Basic net income (loss) per common share ...................... | ($0.01) | $0.06 |
| Diluted net income (loss) per common share: | | |
| Diluted income (loss) before cumulative effect of change in accounting principle ..................... | ($0.01) | $0.15 |
| Cumulative effect of change in accounting principle ............................. | -- | ($0.09) |
| Diluted net income per common share .......................... | ($0.01) | $0.06 |
| Weighted average common shares outstanding .................. | $9,708,741 | $9,708,741 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution ............................ | $9,708,741 | $9,874,688 |

111.    The financial results for the fiscal quarter ended July 30, 2000, as set forth in paragraphs 107-108 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair

presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors. As alleged in paragraphs 40, 42-52 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; Defendants were overstating revenue; and Sabi had been informed by Rosenfeld that the General Ledger was misstated. Defendants knew or were severely reckless in not knowing, of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP. They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly, manipulated earnings; and published the financial results of the Company while they were in possession of or had access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

112. On December 13, 2000, Defendants issued a press release over the Business Wire announcing the Company's financial results for the second quarter of fiscal year 2001, reporting:

> Roadhouse Grill, Inc. reported a 21.4% increase in total revenues to $39.4 million in the second quarter of fiscal year 2001 from $32.5 million in the comparable period in fiscal year 2000. The Company reported a net loss of $2.9 million for the second quarter 2001 versus a net loss of $0.2 million in the same period last year. Diluted earnings per share in the first quarter of fiscal year 2001 was a loss of $0.30 per share in comparison to a loss of $0.02 in the same period of fiscal year 2000. . . .

Roadhouse Grill, Inc. reported a 19.2% increase in total revenues to $80.8 million for the first six months of fiscal year 2001 from $67.8 million in the comparable period in fiscal year 2000. The Company reported a net loss of $3.1 million for the first six months of fiscal 2001 versus breaking even for the same period last year. Net income in the first quarter of fiscal year 2000 included the cumulative effect of a required change in accounting principle related to the treatment of unamortized pre-opening expenses of $1.2 million ($953,000 after tax or $0.10 per diluted share). Diluted earnings per share in the first six months of fiscal 2001was a loss of $0.32 per share versus $0.0 for the same period in the prior year.

The Company's release also quoted Sabi as stating. "In addition, we have instituted significant operational changes and controls which should substantially enhance both sales and execution. In addition, a significant portion of our future growth will come from international franchising and joint ventures, where capital expense and operational drain will be minimized. . . ."

113.    Sabi's statements and the financial results for the fiscal quarter ended October 29, 2000, as set forth in paragraph 112 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the paragraphs 116-117 below. In fact, Defendants knew, or were severely reckless in not knowing, that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-52 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; Defendants were overstating revenue; and Sabi had been informed by Rosenfeld that the General Ledger was misstated.  Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the

65

Company's financial statements were not being prepared in conformity with GAAP. They

knew or were severely reckless in not knowing that the Company's general accounts were not

properly reconciled and that the Company had woefully deficient internal accounting controls;

directly or indirectly, manipulated earnings; and published the financial results of the

Company while they were in possession of or had access to facts suggesting that the

statements were inaccurate, misleading, or incomplete.

    114.    On December 13, 2000, Defendants filed the Company's Report on Form 10-Q

with the SEC that stated the Company's financial results for the fiscal quarter ended October

29, 2000. The Form 10-Q stated, in pertinent part, as follows:

> The consolidated financial statements of Roadhouse Grill, Inc. (the
> "Company") for the thirteen and twenty six weeks ended October 29, 2000 and
> October 24, 1999 are unaudited and reflect all adjustments (consisting of
> normal recurring adjustments) which are, in the opinion of management,
> necessary for a fair presentation of the financial statements for the interim
> periods. The financial statements should be read in conjunction with the notes
> to consolidated financial statements included herein, together with
> management's discussion and analysis of financial condition and results of
> operations, contained in the Company's Annual Report on Form 10-K/A for the
> fifty-three weeks ended April 30, 2000 ("fiscal year 2000").

> * * *

> Total revenues increased $6.9 million, or 21.4%, from $32.4 million for the
> fiscal year 2000 second quarter to $39.4 million for the fiscal year 2001 second
> quarter. This increase is primarily attributable to sales generated at the 19 new
> restaurants opened by the Company since the end of the fiscal year 2000 second
> quarter. Sales at comparable stores for the fiscal year 2001 first quarter
> decreased 3.6% compared with sales in the fiscal year 2000 second quarter.
> The Company believes that this decrease is partially attributable to reduced
> marketing and advertising expenditures in the fiscal year 2001 first quarter as
> compared to the fiscal year 2000 first quarter and increased competition. In the
> second quarter of 2001, the Company launched a radio advertising campaign in
> several media-efficient markets and increased local store marketing. As a

result of the increased advertising in the second quarter 2001, sales at comparable stores were only down 3.6% versus 6.5% for the first quarter of 2001.

115.    The Company filed the following financial results in the above filing:

| | THIRTEEN WEEKS ENDED | | TWENTY-SIX WEEKS ENDED | |
| | OCTOBER 29, 2000 | OCTOBER 24, 1999 | OCTOBER 29, 2000 | OCTOBER 24, 1999 |
|---|---|---|---|---|
| Total revenue | $39,396 | $32,457 | $80,816 | $67,773 |
| Cost of restaurant sales: | | | | |
| Food and beverage | $13,616 | $11,275 | $27,567 | $23,321 |
| Labor and benefits | 13,204 | 9,413 | 25,977 | 19,427 |
| Occupancy and other | 10,297 | 6,901 | 18,688 | 13,863 |
| Pre-opening expenses | 617 | 528 | 1,535 | 576 |
| Total cost of restaurant sales | $37,734 | $28,117 | $73,767 | $57,187 |
| Depreciation and amortization | $2,532 | $2,032 | $4,933 | $4,044 |
| General and administrative | $2,713 | $1,981 | $5,399 | $4,114 |
| Total operating expenses | $42,979 | $32,130 | $84,099 | $65,345 |
| Operating income (loss) | ($3,583) | $327 | ($3,283) | $2,428 |
| Other income (expense): | | | | |
| Interest expense, net | $965 | $597 | $1,633 | $1,178 |
| Income (loss) before taxes and cumulative effect of change in accounting principle | ($4,548) | ($270) | ($4,916) | $1,250 |
| Income tax expense (benefit) | (1,683) | (58) | (1,818) | 276 |
| Income (loss) before cumulative effect of change in accounting principle | ($2,865) | ($212) | ($3,098) | $974 |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) | -- | -- | -- | ($953) |
| Net income (loss) | ($2,865) | ($212) | ($3,098) | $21 |
| Basic net income (loss) per common share | | | | |
| Basic income (loss) before cumulative effect of change in accounting principle | ($0.30) | ($0.02) | ($0.32) | $0.10 |
| Cumulative effect of change in accounting principle | -- | -- | -- | (0.10) |

| | | | | |
|---|---|---|---|---|
| Basic net income (loss) per common share . . . . . | ($0.30) | ($0.02) | ($0.32) | $0.00 |
| Diluted net income (loss) per common share | | | | |
| Diluted income (loss) before cumulative effect of change in accounting principle . . | ($0.30) | ($0.20) | ($0.32) | $0.10 |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . . | -- | -- | -- | (0.10) |
| Diluted net income (lose) per common Share . . | $  (0.30) | $  (0.20) | $  (0.32) | $  0.00 |
| Weighted average common shares outstanding | $9,708,741 | $9,708,741 | $9,708,741 | $9,708,741 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . | $9,708,741 | $9,708,741 | $9,708,741 | $9,836,081 |

116.    However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

117.    The restated financials are:

| | THIRTEEN WEEKS ENDED | | TWENTY-SIX WEEKS ENDED | |
|---|---|---|---|---|
| | OCTOBER 29, 2000 | OCTOBER 24, 1999 | OCTOBER 29, 2000 | OCTOBER 24, 1999 |
| | (As-restated) | (As-restated) | (As-restated) | (As-restated) |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . | $39,396 | $32,457 | $80,816 | $67,773 |
| Cost of restaurant sales: | | | | |
| food and beverage . . . . . . . . . . . . . . . | $13,616 | $11,276 | $27,567 | $23,322 |
| Labor and benefits . . . . . . . . . . . . . . | 12,959 | 9,413 | 25,732 | 19,400 |
| Occupancy and other . . . . . . . . . . . | 10,255 | 7,117 | 18,498 | 14,051 |
| Pre-opening amortization . . . . . . . . . | 617 | 529 | 1,535 | 576 |
| Total cost of restaurant sales . . . . . . . | $37,447 | $28,335 | $73,332 | $57,349 |
| Depreciation and amortization . . . . . . . . . . . . . | $2,532 | $2,032 | $4,883 | $4,093 |

68

| | | | | |
|---|---|---|---|---|
| General and administrative . . . . . . . . . . . . . . . . | $2,713 | $1,980 | $5,399 | $4,114 |
| Total operating expenses . . . . . . . . . . | $42,692 | $32,347 | $83,614 | $65,556 |
| Operating income (loss) . . . . . . . . . . | ($3,296) | $110 | ($2,798) | $2,217 |
| Other income (expense): | | | | |
| Interest expense, net . . . . . . . . . . . . | $965 | $596 | $1,633 | $1,177 |
| Income (loss) before taxes and cumulative effect of change in accounting principle . . . . . . . . . . . | $4,261 | ($486) | ($4,431) | $104,010 |
| Income tax expense (benefit) . . . . . . . . . . . . . . . | (1,432) | (13) | (1,491) | |
| Income (loss) before cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . | ($2,829) | ($473) | ($2,940) | $1,030 |
| Cumulative effect of change in accounting principle (net of tax benefit of $269) . . . . . . . . . | -- | -- | -- | ($877) |
| Net income (loss) . . . . . . . . . . . . . . | ($2,829) | ($473) | ($2,940) | $153 |
| Basic net income (lose) per common share: | | | | |
| Basic income (loss) before cumulative effect of change in accounting principle . . . . | ($0.29) | ($0.05) | ($0.30) | $0.11 |
| Cumulative effect of change in accounting principle . . . . | -- | -- | -- | (0.09) |
| Basic net income (loss) per common share . . . . . | ($0.29) | ($0.05) | ($0.30) | $0.02 |
| Diluted net income (loss) per common share | | | | |
| Diluted income (loss) before cumulative effect of change in accounting principle . . | ($0.29) | ($0.05) | ($0.30) | $0.11 |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . | -- | -- | -- | (0.09) |
| Diluted net income (lose) per common Share . . | $ (0.29) | $ (0.05) | $(0.30) | $ 0.02 |
| Weighted average common shares outstanding | $9,708,741 | $9,708,741 | $9,708,741 | $9,708,741 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . . | $9,708,741 | $9,708,741 | $9,708,741 | $9,836,081 |

118.     The financial results for the fiscal quarter ended October 29, 2000, as set forth in paragraphs 114-115 above, were knowingly or with severe recklessness misstated by

69

Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-52 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; Defendants were overstating revenue; and Sabi had been informed by Rosenfeld that the General Ledger was misstated.  Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP.  They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly, manipulated earnings; and published the financial results of the Company while they were in possession of or had access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

119.    On March 14, 2001, Defendants issued a press release over the <u>Business Wire</u> reporting the Company's results for the third quarter of fiscal 2001:

Roadhouse Grill, Inc. reported a 16.4% increase in total revenues to $41.8 million in the third quarter of fiscal year 2001 up from $35.9 million in the comparable period in fiscal year 2000. The Company reported a pre-tax operating loss before asset impairment of $5.5 million for the third quarter 2001 versus a pre-tax profit of $0.2 million in the same period last year. The Company reported a net loss of $11.3 million for the third quarter of fiscal year 2001 versus a net profit of $0.2 million in the third quarter of fiscal year 2000. Diluted earnings per share in the third quarter of fiscal year 2001 was a loss of $1.17 per share in comparison to a profit of $0.02 in the same period of fiscal year 2000. . . .

Roadhouse Grill, Inc. reported an 18.2% increase in total revenues to $122.6 million for the first nine months of fiscal year 2001 from $103.7 million in the comparable period in fiscal year 2000. The Company reported a net loss of $14.4 million for the first nine months of fiscal 2001 versus a $0.2 million profit during the first nine months of fiscal year 2000. Net income in the first quarter of fiscal year 2000 included the cumulative effect of a required change in accounting principle related to the treatment of unamortized pre-opening expenses of $1.2 million ($953,000 after tax or $0.10 per diluted share). Diluted earnings per share in the first nine months of fiscal 2001 was a loss of $1.49 per share versus $0.02 for the same period in the prior year.

120.    On March 14, 2001, Defendants filed the Company's Report on Form 10-Q with the SEC that stated the Company's financial results for the fiscal quarter ended January 28, 2001. The Form 10-Q stated, in pertinent part, as follows:

The consolidated financial statements of Roadhouse Grill, Inc. (the "Company") for the thirteen and thirty nine weeks ended January 28, 2001 and January 23, 2000 are unaudited and reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management, necessary for a fair presentation of the financial statements for the interim periods. The financial statements should be read in conjunction with the notes to consolidated financial statements included herein, together with management's discussion and analysis of financial condition and results of operations, contained in the Company's Annual Report on Form 10-K/A for the fifty-three weeks ended April 30, 2000 ("fiscal year 2000").

* * *

71

Total revenues increased $5.9 million, or 16.4%, from $35.9 million for the fiscal year 2000 third quarter to $41.8 million for the fiscal year 2001 third quarter. This increase is primarily attributable to sales generated at the 18 new restaurants opened by the Company since the end of the fiscal year 2000 third quarter. Sales at comparable stores for the fiscal year 2001 third quarter decreased 4.5% compared with sales in the fiscal year 2000 third quarter. The Company believes that this decrease is partially attributable to reduced marketing and advertising expenditures in fiscal year 2001 as compared to the fiscal year 2000 and increased competition. The Company spent 4.2% of revenue on marketing expense in the first nine months of 2000 versus only 3.0% in the first nine months of fiscal year 2001.

121.    The Company filed the following financial results in the above filing:

|  | Thirteen Weeks Ended | | Thirty-nine Weeks Ended | |
|---|---|---|---|---|
|  | January 28, 2001 | January 23, 2000 | January 28, 2001 | January 23, 2000 |
| Total revenue | $41,789 | $35,918 | $122,605 | $103,690 |
| Cost of restaurant sales: | | | | |
| Food and beverage | $15,345 | $12,171 | $42,910 | $35,492 |
| Labor and benefits | 13,931 | 10,707 | 39,909 | 30,134 |
| Occupancy and other | 11,373 | 7,433 | 30,061 | 21,296 |
| Pre-opening expenses | 556 | 749 | 2,091 | 1,325 |
| Total cost of restaurant sales | $41,205 | $31,060 | $114,971 | $88,247 |
| Depreciation and amortization | $2,496 | $2,162 | $7,429 | $6,206 |
| General and administrative | $2,707 | $1,890 | $8,108 | $6,004 |
| Impairment of long-lived assets | $3,066 | $0 | $3,066 | $0 |
| Total operating expenses | $49,474 | $35,112 | $133,574 | $100,457 |
| Operating income (loss) | ($7,685) | $806 | ($10,969) | $3,233 |
| Other income (expense): | | | | |
| Interest expense, net | $933 | $544 | $2,565 | $1,721 |
| Income (loss) before taxes and cumulative effect of change in accounting principle | ($8,618) | $262 | ($13,534) | $1,512 |
| Income tax expense | 2,728 | 58 | 909 | 334 |
| Income (loss) before cumulative effect of change in accounting principle | ($11,346) | $204 | ($14,443) | $1,178 |

72

| | | | | |
|---|---|---|---|---|
| Cumulative effect of change in accounting principle (net of tax benefit of $269) ......... | $0 | $0 | $0 | ($953) |
| Net income (loss) .............. | ($11,346) | $204 | ($14,443) | $225 |
| Basic net income (los) per common share: | | | | |
| Basic income (loss) before cumulative effect of change in accounting principle .... | ($1.17) | $0.02 | ($1.49) | $0.12 |
| Cumulative effect of change in accounting principle ........................... | 0 | 0 | 0 | (0.10) |
| Basic net income (loss) per common share ..... | ($1.17) | $0.02 | ($1.49) | $0.02 |
| Diluted net income (loss) per common share | | | | |
| Diluted income (loss) before cumulative effect of change in accounting principle .. | ($1.17) | $0.02 | ($1.49) | $0.12 |
| Cumulative effect of change in accounting principle ...................... | 0 | 0 | 0 | (0.10) |
| Diluted net income (lose) per common Share .. | $(1.17) | $0.02 | $(1.49) | $0.02 |
| Weighted average common shares outstanding | $9,708,741 | $9,708,741 | $9,708,741 | $9,708,741 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution ....................... | $9,708,741 | $9,779,825 | $9,708,741 | $9,787,751 |

122.    However on August 14, 2001, the Company restated those same financial results.  In fact, the Company restated its financial statements for the fiscal years ended 1999 and 2000 and the first three fiscal quarters of fiscal 2001.  The Company stated in its Annual Report filed with the SEC on August 14, 2001 on Form 10-K for the Fiscal Year ended April 25, 1999 that: "The restatement corrects various errors the Company identified as a result of a review of its accounting records with respect to historical financial statements."

123.    The restated financials are:

| | Thirteen Weeks Ended | | Thirty-Nine Weeks Ended | |
| --- | --- | --- | --- | --- |
| | January 28, 2001 | January 23, 2000 | January 28, 2001 | January 23, 2000 |
| | (As restated) | (As restated) | (As restated) | (As restated) |
| Total revenue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $41,789 | $35,917 | $122,605 | $103,690 |
| Cost of restaurant sales: | | | | |
| Food and beverage . . . . . . . . . . . . . . . . . . . . . | $15,060 | $12,171 | $42,625 | $35,492 |
| Labor and benefits . . . . . . . . . . . . . . . . . . . . . | $13,931 | $10,707 | $39,664 | $30,106 |
| Occupancy and other . . . . . . . . . . . . . . . . . . . | $10,544 | $7,709 | $29,042 | $21,763 |
| Pre-opening expenses . . . . . . . . . . . . . . . . . . . | $556 | $749 | $2,091 | $1,325 |
| Total cost of restaurant sales . . . . . . . . . . . . . . . | $40,091 | $31,336 | $113,422 | $88,686 |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . . | $2,496 | $2,162 | $7,379 | $6,254 |
| General and administrative expenses . . . . . . . . . . . . . . . . . | $2,707 | $1,890 | $8,108 | $6,004 |
| Total operating expenses . . . . . . . . . . . . . . . . . . | $48,360 | $35,388 | $131,975 | $100,944 |
| Operating income (loss) . . . . . . . . . . . . . . . . . . | ($6,571) | $529 | ($9,370) | $2,746 |
| Other income (expense): | | | | |
| Interest expense, net . . . . . . . . . . . . . . . . . . . . | $933 | $544 | $2,564 | $1,721 |
| Income (loss) before taxes and cumulative effect of change in accounting principle . . . . . . | ($7,504) | ($15) | ($11,934) | $1,025 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,309 | $0 | $1,818 | $10 |
| Income(loss) before cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . . | ($10,813) | ($15) | ($13,752) | $1,015 |
| Cumulative effect of change in accounting principle (net of tax benefit of $248) . . . . . . . . . . . . . . . . | $0 | $0 | $0 | ($877) |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($10,813) | ($15) | ($13,752) | $138 |
| Basic net income per common share: | ($1.11) | (--) | ($1.42) | $0.10 |
| Basic income (loss) before cumulative effect of change in accounting principle . . . . . . . . . . . . . | | | | |
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . | $0.00 | $0.00 | $0.00 | ($0.09) |
| Basic Net income (loss) per common share . . . . . . . . . . . | ($1.11) | (--) | ($1.42) | $0.01 |
| Diluted net income per common share: | ($1.11) | $0.00 | ($1.42) | $0.10 |
| Diluted income (loss) before cumulative effect of change in accounting principle . . . . . . | | | | |

| | | | | |
|---|---|---|---|---|
| Cumulative effect of change in accounting principle . . . . . . . . . . . . . . . . . . . . . | $0.00 | $0.00 | $0.00 | ($0.09) |
| Diluted net income (loss) per common share . . . . . . . . . . . | ($1.11) | $0.00 | ($1.42) | $0.01 |
| Weighted average common shares outstanding . . . . . . . . . | $9,708,741 | $9,708,741 | $9,708,741 | $9,708,741 |
| Weighted average common shares and shares equivalent outstanding-assuming dilution . . . . . . . . . . . . . . . . . . . . . | $9,708,741 | $9,779,825 | $9,708,741 | $9,787,751 |

124.    The financial results for the fiscal quarter ended January 28, 2001, as set forth in paragraphs 119-121 above, were knowingly or with severe recklessness misstated by Defendants and were materially misleading as evidenced by the restatement of the Company's financial statements for this period set forth in the preceding paragraph.  Moreover, contrary to Defendants' representations that the financial statements "reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of management necessary for a fair presentation of the financial statements for the interim periods," in fact, Defendants knew or were severely reckless in not knowing that these financial statements were not prepared in conformity with GAAP and contained serious accounting errors.  As alleged in paragraphs 40, 42-55 above, Rosenfeld, the former Chief Financial Officer, stated in sworn deposition testimony that the General Ledger had not been reconciled for years; the Company was not keeping its books in accordance with GAAP; Defendants were overstating revenue; and Sabi had been informed by Rosenfeld that the General Ledger was misstated.  Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have alerted them to the fact that the Company's financial statements were not being prepared in conformity with GAAP.  They knew or were severely reckless in not knowing that the Company's general accounts were not properly reconciled and that the Company had woefully deficient internal accounting controls; directly or indirectly,

manipulated earnings; and published the financial results of the Company while they were in

possession of or had access to facts suggesting that the statements were inaccurate,

misleading, or incomplete.

### THE TRUTH ABOUT THE COMPANY'S FALSE
### FINANCIAL STATEMENTS IS FINALLY REVEALED

125.    On August 1, 2001, Roadhouse Grill shocked the market when it announced

that as a result of substantial accounting irregularities in its financial statements for a multi-

year period, the Company would likely restate these financial statements.  The press release

stated, in pertinent part, as follows:

**Roadhouse Grill Announces Review of Financial Statements;
No Change to Net Sales Is Anticipated**

POMPANO BEACH, Fla.--Aug. 1, 2001--ROADHOUSE GRILL, INC.
(Nasdaq: GRLL), a full service, casual dining restaurant operator, today
announced that as a result of a review by the company's audit committee and
after continued discussions with the company's independent auditors, the
company has determined that it is likely that it will restate its audited financial
statements for fiscal years ended April 25, 1999 and April 30, 2000 and the
related quarterly periods, as well as for the quarters ended July 30, 2000,
October 29, 2000 and January 28, 2001.  The restatement may be necessary as a
result of inaccuracies that have been identified in the company's accounting for
various operating expenses.  The revisions are not anticipated to have an effect
on net sales reported for any of these periods.  The company expects that the
restatement would result in a material decrease in net income for the fiscal
years ended April 25, 1999 and April 30, 2000 and the related quarterly
periods, and a material increase in net income for the quarters ended July 30,
2000, October 29, 2000 and January 28, 2001.  In addition, the company
expects to incur a net loss for the fiscal year and quarter ended April 29, 2001
as opposed to net income in the fiscal year and quarter ended April 30, 2000.
The company said that it anticipates filing amended reports on Form 10-K/A
for fiscal years ended April 25, 1999 and April 30, 2000 and on Form 10-Q/A
for the related quarterly periods, as well as for the quarters ended July 30, 2000,
October 29, 2000 and January 28, 2001.  The Company also announced that, as
a result of the anticipated restatements, the company's audited financial

statements for the year ended April 29, 2001, are not complete.  The Company plans to release these financial results, and file its Form 10-K on or before August 14, 2001.

126.     In response, NASDAQ halted trading of Roadhouse common stock pending an investigation into the accounting irregularities.  The trading halt was put in place on August 1, 2001.  The press release stated, in pertinent part, as follows:

### Nasdaq Changes Status of Roadhouse Grill, Inc. and Requests Additional Information from Company

Washington, D.C.-The Nasdaq Stock Market® announced today that the trading halt status in Roadhouse Grill, Inc., (NASDAQ: GRLL) was changed to "additional information requested" from the company.  Trading in the company had been halted today at 8:52 a.m. Eastern Time for News Pending at a last sale price of 1.35.  Trading will remain halted until Roadhouse Grill, Inc. has fully satisfied Nasdaq's request for additional information.

127.     On September 7, 2001, NASDAQ announced that trading for Roadhouse Grill's common stock would resume on September 10, 2001.  The press release announcing the halt in trading stated, in pertinent part, as follows:

### Nasdaq Scheduled Resumption in Trading in Roadhouse Grill Inc.

Washington, D.C.-The Nasdaq Stock Market announced today that the trading in Roadhouse Grill Inc. (NASDAQ: GRLL) is scheduled to resume on Monday, September 10 at 10:00 a.m., Eastern Time.

128.     Once trading resumed after being halted for over a month, the price of Roadhouse Grill common stock plunged $0.56 per share to $0.60 -- a drop of nearly 50%.  As a result of Defendants' fraud, investors who purchased Roadhouse Grill common stock on the

open market during the Class Period, relying on the integrity of the Company's financial

statements and Defendants' public statements, have sustained enormous losses.

129.    On August 14, 2001, as set forth above, Roadhouse Grill filed amended

financial statements with the SEC for fiscal years 1999 and 2000 and quarters ended July 30,

2000, October 29, 2000, and January 28, 2001.

130.    On August 15, 2001, Defendants announced the Company's 2001 Year End

results and the restatements for fiscal years 1999 and 2000 and quarters ended July 30, 2000,

October 29, 2000, and January 28, 2001.  The press release stated, in pertinent part, as

follows:

**Roadhouse Grill Reports Fourth Quarter and Fiscal Year End 2001 Results and
Restatement of Annual and Quarterly Statements for Fiscal Years 1999, 2000 and 2001**

\* \* \*

The Company's auditors stated in its report on the Company's financial
statements for fiscal 2001 that because of the Company's significant cash flow
problems, the net loss for fiscal 2001 and defaults under certain of the
Company's loan facilities, covenants, and payment provisions, there is
substantial doubt about the Company's ability to continue as a going concern.
Ayman Sabi, the President and Chief Executive Officer of the Company, stated
"We believe our cash flows from operations will satisfy liquidity requirements
in fiscal year 2002."

As previously announced, as a result of a review of its accounting records, the
Company restated its previously reported audited financial statements for the
fiscal years ended April 25, 1999 and April 30, 2000 and the related unaudited
quarterly financial statements for those periods, as well as the unaudited
quarterly financial statements for the quarters ended July 30, 2000, October 29,
2000 and January 28, 2001.  The net impact of the restatement resulted in a
decrease in net income and basic and diluted earnings per share for the
fifty-three weeks ended April 30, 2000 of $906,000 and $0.10 and $0.09 per
share, respectively.  The restatement also resulted in a decrease in net income
and both basic and diluted earnings per share for the fifty-two weeks ended
April 25, 1999 of $300,000 and $0.03 per share.  The Company filed amended

Form 10-K's for fiscal years 2000 and 1999 and amended Form 10-Q's for fiscal years 1999, 2000 and 2001 quarters.

Ayman Sabi, President and Chief Executive Officer, in summarizing the Company's recent performance, stated: "During the past 24 month period, management has focused on market expansion with the opening of approximately 30 new restaurants. We have significantly slowed our growth and plan to open only four new restaurants in fiscal year 2002. We are now investing our resources in management systems to both manage our larger operations and react quickly in each local market. This record growth and investment in future shareholder value, coupled with the reduction in our marketing efforts during our period of aggressive growth, has reduced profitability and stretched our capital resources. This is the unavoidable cost a company endures when it needs to invest in infrastructure, as it transitions into a larger concern," said Mr. Sabi. "Management will now concentrate on utilizing the now expanded resources of Roadhouse Grill to build sales and profitability," Mr. Sabi said. "Given the current outlook of the general economy, we intend to shift our focus from growth in the number of restaurants to increasing revenues for each restaurant and decreasing expenses."

131.    Also in the same August 15, 2001 press release, the Company announced that Roadhouse Grill's auditors, KPMG, had issued a going concern warning expressing doubt that the Company had the ability to continue as a going concern. The release stated, in pertinent part, as follows:

The Company's auditors stated in its report on the Company's financial statements for fiscal 2001 that because of the Company's significant cash flow problems, the net loss for fiscal 2001 and defaults under certain of the Company's loan facilities, covenants, and payment provisions, there is substantial doubt about the Company's ability to continue as a going concern.

132.    On January 18, 2002, certain creditors forced Roadhouse Grill into involuntary bankruptcy.

133.    As now revealed, at all times during the Class Period, Defendants issued false and materially misleading financial statements and press releases concerning Roadhouse

Grill's revenues, income, expenses, and earnings per share. The financial statements of the Company made during the Class Period, all of which Defendants stated implicitly and/or expressly were prepared in conformity with GAAP, were materially false and misleading, as alleged above, because the Company materially misstated its revenues, income, earnings, expenses, and net worth.

134.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Roadhouse Grill's securities, by publicly issuing materially false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the financial condition of the Company, including, inter alia:

a.    that the Company's financial statements were not prepared in accordance with GAAP and in accordance with the federal securities laws and SEC regulations concerning fair reporting;

b.    that the Company had violated GAAP and its own internal accounting policies by improperly accounting for and fabricating its revenue, expenses, and income;

c.    that the Company's reported revenue, income, and expenses were the result of accounting improprieties;

d.    that the Company's reported statements concerning its financial statements were lacking in reasonable basis at all relevant times;

e.      that the Company had inadequate accounting controls;

f.      that the Company failed to properly reconcile its general accounts;

g.      that the Company had manipulated earnings;

h.      that Defendants knew or were severely reckless in not knowing of a number of red flags and warning signs of improprieties that would have advised them that the Company's financial statements were not prepared in conformity with GAAP; and

i.      that Defendants published the financial results of the Company while in possession of or having access to facts suggesting that the statements were inaccurate, misleading, or incomplete.

## **ROADHOUSE GRILL'S FALSE FINANCIAL STATEMENTS**

135.    Roadhouse Grill's financial statements for fiscal years 1999 and 2000 and quarters ended July 30, 2000, October 29, 2000, and January 28, 2001, as reported in the Company's Forms 10-K and 10-Q filed with the SEC, were fraudulent, materially misleading, and violated GAAP.  The Individual Defendants signed the reports as alleged in paragraphs 16 and 17 above.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate despite footnote or other disclosure.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

136.    As noted by the American Institute of Certified Public Accountants' ("AICPA") professional standards:

Financial statements are management's responsibility. . . .  Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and related assets, liabilities and equity are within the direct knowledge and control of management. . . .  Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

137.    Accounting Research Bulletin ("ARB") Opinion No. 28, "Interim Financial Reporting," requires that an enterprise prepare its interim financial statements based on the accounting principles and practices used in preparation of its latest financial statements, unless it discloses a change in an accounting policy or practice.  APB Opinion No. 28, ¶ 9 states:

Interim financial information is essential to provide investors and others with timely information as to the progress of the enterprise.  The usefulness of such information rests on the relationship that it has to the annual results of an operation.  Accordingly, the Board has concluded that each interim period should be viewed primarily as an integral part of an annual period.

138.    GAAP requires the restatement of previously issued financial statements for the correction of a material error in the financial statements of a prior period when "[e]rrors in financial statements that result from . . . *misuse of facts that existed at the time the financial statements were prepared*."  APB No. 20 (Emphasis added).  The same GAAP standard requires restatement of previously reported financial statements if the misuse of facts that existed at the time the financial statements were prepared caused reported net income to be materially misstated.  Accordingly, the restatement of Roadhouse Grill's previously reported financial statements and earnings is itself an admission that the originally issued financial information was materially false and misleading when first reported.

139.     Due to these accounting improprieties, Defendants presented Roadhouse Grill's financial results and statements in a manner that violated GAAP in at least the following ways:

a.      the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (Concepts No. 1, ¶ 134);

b.      the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (Concepts No. 1, ¶ 40);

c.      the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (shareholders) for the use of enterprise resources entrusted to it (to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general) (Concepts No. 1, ¶ 50);

d.      the principle that financial reporting should be reliable in that it represents what it purports to represent and that information should be reliable as well as relevant, a notion that is central to accounting (Concepts No. 2, ¶¶ 58-59);

e.      the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (Concepts No. 2, ¶ 79); and

      f.     the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (Concepts No, 2, ¶ 95).

## ADDITIONAL SCIENTER

140.   As alleged herein, Defendants acted with scienter in that Defendants knew or were severely reckless in not knowing that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were severely reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein, in detail, Defendants by virtue of their receipt of information reflecting the true facts regarding Roadhouse Grill, their control over, and/or receipt and/or modification of Roadhouse Grill's misleading misstatements and/or their association with the Company that made them privy to confidential proprietary information concerning Roadhouse Grill, participated in the fraudulent scheme alleged herein.

141.   Defendants knew or were severely reckless in not knowing that there were no internal controls over the accounting and that the general accounts had not been reconciled for a period of years.  Defendants knowingly misstated or were severely reckless in misstating the Company's financial condition and knowingly or severely recklessly departed from the standards of ordinary care by disseminating financial statements without assuring the reconciliation of the general accounts, instituting internal controls, and following GAAP.

142.    Defendants knowingly or severely recklessly manipulated earnings in such a manner as to render the financial statements issued during the Class Period materially misleading and false.  The manipulation of earnings is an extreme departure from the standards of ordinary care.

143.    As demonstrated by Rosenfeld's testimony restated in paragraphs 40-55, Defendants intentionally misstated the Company's financial statements, or at the very least acted in a severely reckless manner in issuing the materially false and misleading statements.  At the time that Defendants published the Company's financial statements in SEC Forms 10-Q and 10-K, Defendants had possession of or access to facts showing that the statements were inaccurate, misleading, or incomplete.

144.    According to Rosenfeld, as early as a few days after he arrived at the Company and found the state of the accounting records were "horrific," Rosenfeld personally advised Sabi of these severe problems.  Moreover, Rosenfeld told Sabi and the Board of Directors by January 2001 that revenue, operating income, and earnings were all materially misstated for a multi-year period and were required to be restated.  Yet they refused to do so.

145.    Rosenfeld also testified that members of the audit committee and the Board acknowledged that Sabi was not carrying out his duties.  Rosenfeld stated, "I think Phil Friedman – either Phil Friedman or Phil Ratner said to Ayman Sabi, which never made it into the records of the Board, if we had the votes to terminate you, we would, and from then on they continued to ask questions how to do it."  Rosenfeld Dep. at 55.

146.    Though Tan was the Chairman of the Board of Directors, owned a majority of Roadhouse Grill stock and signed Form 10-Ks during the Class Period, Rosenfeld testified "Vincent Tan has never been present at one Board meeting I've been at in person or telephonically." Indeed, Rosenfeld Dep. at 34. Rosenfeld, the Chief Financial Officer of a public company, had never met and had never communicated with Tan, the Chairman of the Company. Rosenfeld Dep. at 57. These remarkable facts of Tan's total invisibility from a public company where he was the Chairman demonstrate that Tan was at least severely reckless in allowing the financial statements to be published during the Class Period, including the two false Form 10-K's which Tan personally signed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

147.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    the omissions and misrepresentations were material;

c.    the securities of the Company traded in an open and efficient market;

d.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.      Plaintiffs and members of the Class purchased their Roadhouse Grill stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

148.    At all relevant times, the market for Roadhouse Grill's stock was an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in Roadhouse Grill's stock price. Under these circumstances, all purchasers of Roadhouse Grill's securities during the Class Period suffered similar injury through their purchase of Roadhouse Grill's securities at artificially inflated prices and a presumption of reliance applies.

149.    The common stock for Roadhouse Grill met the requirements for listing and was listed and actively traded on the NASDAQ, a highly developed and efficient market.

150.    Based upon the following, Plaintiffs and members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

151.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. The specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Roadhouse Grill who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

152.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

153.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and other Class members, as alleged herein and caused Plaintiffs and other members of the Class to purchase Roadhouse Grill's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

154.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Roadhouse Grill's securities in an effort to maintain artificially high market prices for Roadhouse Grill's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

155.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the financial condition, business, operations and future prospects of Roadhouse Grill, and to misstate the financial condition of the Company as specified herein.

156.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Roadhouse Grill's financial value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Roadhouse Grill and its financial statements, financial condition, businesses operations, and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Roadhouse Grill securities during the Class Period.

157.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Roadhouse Grill during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue

of his responsibilities and activities as a senior officer and/or director of Roadhouse Grill was

privy to and participated in the creation, development and reporting of Roadhouse Grill's

financial statements, financial condition, internal budgets, plans, projections and/or reports;

(iii) each of these Defendants enjoyed significant personal contact and familiarity with the

other Defendant and was advised of and/or had access to other members of Roadhouse Grill's

management team, internal reports and other data and information about the Roadhouse

Grill's finances, operations, and sales at all relevant times; and (iv) each of these Defendants

was aware of the Roadhouse Grill's dissemination of information to the investing public

which they knew or were severely reckless in not knowing was materially false and

misleading.

158.     Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with severely reckless disregard for the truth in that

they failed to ascertain and to disclose such facts, even though such facts were available to

them.  Such Defendants' material misrepresentations and/or omissions were done knowingly

or severely recklessly and for the purpose and effect of concealing Roadhouse Grill's true

financial condition and future business prospects from the investing public and supporting the

artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of

Roadhouse Grill's financial statements, financial condition, businesses, operations, and

earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were severely reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether

those statements were false or materially misleading.

159.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Roadhouse Grill's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Roadhouse Grill's publicly-traded securities were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Roadhouse Grill securities during the Class Period at artificially high prices and were damaged thereby.

160.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the financial condition of and the problems that Roadhouse Grill was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Roadhouse Grill securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

161.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

162.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Roadhouse Grill's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act
### Against Individual Defendants

163.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

164.    The Individual Defendants acted as controlling persons of Roadhouse Grill within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by Roadhouse Grill with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Roadhouse Grill, including the content and dissemination of the various statements which Plaintiffs contend are materially false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of Roadhouse Grill's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.    In particular, each of these Defendants signed and issued each of the SEC filings and public statements and, therefore, are presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

166.     As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Roadhouse Grill's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.       Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

b.       Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.       Awarding Lead Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs and expenses; and

d.       Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:   May  5th, 2003

                              **GORDON & DONER, P.A.**

                              By: _____
                              Adam Doner
                              4114 Northlake Blvd.
                              Second Floor
                              Palm Beach Gardens, Florida 33410
                              Phone: (561) 799-5070
                              Fax:    (561) 799-4050

                              **BERNSTEIN LIEBHARD & LIFSHITZ,
                              LLP**
                              Robert J. Berg
                              Michael S. Bigin
                              10 East 40th Street
                              New York, NY 10016
                              Phone: (212) 779-1414
                              Fax:    (212) 779-3216

                              Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

    I do hereby certify that on this _5th_ day of May, 2003, a true and correct copy of *Plaintiffs' Second Amended Class Action Complaint* has been duly and properly served upon counsel of record in the various cases by **hand delivery**, as follows:

Christian Bartholomew, Esq.
Morgan, Lewis & Brockius LLP
5300 First Union Financial Center
200 Biscayne Blvd.
Miami, FL  33131-2339

Attorney for Defendants Roadhouse Grill,
Ayman Sabi and Vincent Tan